[No. A126053. First Dist., Div. Five. Feb. 14, 2012.]

SCI CALIFORNIA FUNERAL SERVICES, INC., Plaintiff, Cross-defendant and Appellant, v.
FIVE BRIDGES FOUNDATION, Defendant, Cross-complainant and Appellant.

[No. A126337. First Dist., Div. Five. Feb. 14, 2012.]

SCI CALIFORNIA FUNERAL SERVICES, INC., Plaintiff, Cross-defendant and Respondent, v.
FIVE BRIDGES FOUNDATION, Defendant, Cross-complainant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.E., F., II., III., IV., V., VI., and VII.B.

550

COUNSEL

Gurnee & Daniels, Steven H. Gurnee, Nicholas P. Forestiere and Candace H. Shirley for Plaintiff, Cross-defendant and Appellant and for Plaintiff, Cross-defendant and Respondent.

Shartsis Friese, Joel Zeldin, Anthony B. Leuin, John J. Stein; Morgan, Lewis & Blockius and Thomas M. Peterson for Defendant, Cross-complainant and Appellant.

## OPINION

**SIMONS, J.**—These cross-appeals arise from a long-running dispute over a business deal gone sour. In 1998, SCI California Funeral Services, Inc. (SCI), contracted with the predecessor of Five Bridges Foundation (Five Bridges) to purchase the assets of a cemetery in Colma, California. The asset purchase agreement provided SCI would acquire certain real estate assets, including an option agreement to purchase additional cemetery acreage and an easement giving it signage rights on nearby property. SCI, however, did not receive the option agreement or easement and sued Five Bridges, alleging breach of the asset purchase agreement and other claims. Five Bridges countersued.

After disposing of a number of the claims prior to trial, the superior court rendered a decision that has satisfied neither party. While the court ruled against SCI on SCI's contractual claim regarding the option agreement, it ultimately found Five Bridges liable for breach of contract because of Five Bridges's failure to deliver the easement. It awarded SCI significant damages, although the sum was substantially less than SCI had sought. SCI claimed it was the party prevailing on the contract and requested an award of attorney fees on that basis. The trial court denied its request.

Both parties have appealed from the resulting judgment. Five Bridges contends it was not liable on the contract for various reasons, and it disputes the validity and sufficiency of SCI's damages evidence. Among other conclusions, we determine that, in the circumstances of this case, the trial court properly relied on the unique value of the easement to the servient estate in determining SCI's damages. SCI seeks reversal of the trial court's denial of its request for attorney fees. We affirm the judgment, but reverse the attorney fee order in part.

### FACTUAL AND PROCEDURAL BACKGROUND

The long history of this case has produced a voluminous record.[1] We set forth only those facts relevant to resolution of the issues on appeal. We recite

---

[1] Our review of the record has been hampered by both parties' failure to comply with California Rules of Court, rule 8.204(a)(1)(C). That rule requires record references in briefs to be supported "by a citation to *the volume and page number* of the record where the matter appears." (Italics added.) Under the rule, "[r]ecord citations must refer to the appropriate transcript, its *volume number* and the *exact page number* (e.g., '1 RT 25')." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2011) ¶ 9:37, p. 9-13 (rev. # 1, 2011).) Here, the briefs refer only to page numbers and do not direct us to the volumes of the record in which those pages appear. This has made our task particularly onerous, because the record on appeal is comprised of a joint 32-volume appendix, SCI's separate two-volume appendix, and 18 volumes of reporter's transcript, which together total over 10,000 pages. Instead of providing us with volume numbers, counsel have cited to inserter tabs in the joint appendix. While some courts have encouraged the use of such tabs (*Doppes v. Bentley Motors,*

the facts in the manner most favorable to the judgment and resolve all conflicts and draw all inferences in favor of the prevailing party. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1233, fn. 2 [19 Cal.Rptr.3d 416].) Many of the facts were hotly disputed, and we describe those evidentiary conflicts necessary to an understanding of the issues on appeal. (See *ibid.*)

## Olivet Memorial Park

In approximately 1895, Olivet Memorial Park (Olivet) began operating a cemetery in Colma. All of the land on which Olivet's cemetery was located was owned by Cypress Abbey Company (Cypress Abbey), which also owned a cemetery known as Cypress Lawn. Olivet would develop land owned by Cypress Abbey for cemetery purposes, and, as it sold gravesites, Olivet would pay Cypress Abbey a portion of the sales price. Thus, under the terms of the contract between them, Olivet acquired land from Cypress Abbey and sold it as it was needed.

In the late 1970's, Olivet and Cypress Abbey decided to restructure their relationship. In 1982, each conveyed to the other various rights and interests, two of which are central to this litigation. First, Olivet received an easement for signage purposes (the Ornamental Easement) in an area of Cypress Abbey's property on both sides of Olivet Parkway at the intersection with El Camino Real.[2] The terms of the Ornamental Easement permitted Olivet to place and maintain at that location "signs, embellishments and other structures as are appropriate and befitting to an entranceway of a cemetery." The Ornamental Easement would endure so long as Olivet or its successors were actively operating the cemetery and selling graves.

In addition to the Ornamental Easement, the parties entered into an agreement giving Olivet the option to purchase adjacent property from Cypress Abbey (the Option Agreement). The option property consisted of two parcels—a 2.11-acre parcel and an 8.71-acre parcel, a combined total of almost 11 acres.[3] The additional property was necessary to enable Olivet to

---

*Inc.* (2009) 174 Cal.App.4th 967, 989 [94 Cal.Rptr.3d 802]), they cannot substitute for proper citation to the volume of the record (cf. *Wells Fargo Bank v. California Ins. Guarantee Assn.* (1995) 38 Cal.App.4th 936, 939, fn. 1 [45 Cal.Rptr.2d 537] [criticizing citation to tabs in joint appendix when rules require consecutive pagination]). We advise counsel that we may strike noncompliant briefs. (Cal. Rules of Court, rule 8.204(e)(2)(B).)

[2] In the record and in the briefs, the Ornamental Easement is referred to variously as an "ornamental easement," a "signage easement," an "ornamental signage easement," and a "frontage easement."

[3] At trial, the area of the larger parcel was sometimes put at 8.72 acres. We will use the 8.71-acre figure, but the discrepancy is not relevant to the issues on appeal.

expand its cemetery and continue to make profits.[4] The Option Agreement contained a provision governing how the parties would calculate the purchase price of property subject to the option. In addition, section 12 of the Option Agreement stated, "should either party breach this Agreement, money damages would not be an adequate remedy for the non-breaching party and for that reason, the parties agree that each shall be entitled to specific performance of any term, covenant or condition of [the Option] Agreement." Both the Ornamental Easement and the Option Agreement were recorded on July 2, 1982.

### Olivet's Negotiations with SCI and Cypress Abbey

In the mid-1990's, Olivet began exploring the possibility of selling its cemetery assets. In late 1995, Olivet began to furnish information to SCI so that SCI could evaluate whether to purchase those assets. Kallgren represented Olivet in these discussions; his primary contacts at SCI were Lowell Kirkpatrick, Jr., SCI's director of corporate development, and Kirkpatrick's assistant, Deborah Fisher Young.

SCI was seeking to acquire a cemetery that would have a useful life of 40 to 50 years. Because Olivet's existing inventory was very limited, SCI was only interested in acquiring its assets if the deal included the option to acquire additional land for graves from Cypress Abbey. It was clear that SCI would not have gone forward with the transaction if it had not included the option to acquire the additional acreage. Kallgren was aware of the importance SCI attached to the ability to acquire additional land for graves.

After it had entered into discussions with SCI, on November 26, 1996, Olivet informed Cypress Abbey it intended to exercise its option to buy the 2.11-acre parcel. Olivet proposed a purchase price based upon the formula contained in the Option Agreement. Cypress Abbey did not respond to Olivet's notice for several months. When Cypress Abbey did respond, it disagreed with Olivet's calculation of the purchase price. In addition, Cypress Abbey indicated its desire to discuss other issues. Among them was Olivet's possible release of the Ornamental Easement, in exchange for which Cypress Abbey would provide Olivet with a new water well.

---

[4] As Olivet's president, Edward Kallgren, explained at trial, a cemetery having no further inventory to sell ceases to operate as a profit-making cemetery business and essentially becomes a memorial park. It generally assumes nonprofit status and, using its endowment care fund or other resources, continues to maintain the property for the benefit of those buried there.

Eventually, at a meeting on January 8, 1998, at which a number of issues were discussed, Olivet and Cypress Abbey reached an agreement on the sale price for the 2.11 acres. After the meeting, Kallgren exchanged correspondence with Cypress Abbey's counsel, Peter Wohlfeiler. On the day following the meeting, Wohlfeiler sent Kallgren a draft letter agreement summarizing what Olivet and Cypress Abbey had agreed upon. The draft letter agreement dealt with both the sale of the 2.11-acre parcel and Olivet's release of the Ornamental Easement to Cypress Abbey. Wohlfeiler's draft called for Olivet to pay $800,000 for the 2.11-acre parcel. Regarding the Ornamental Easement, the draft letter agreement stated that "Olivet and [Cypress Abbey] *have agreed* as follows: [¶] . . . Olivet *will release all of its right, title and interest* in the [Ornamental Easement] . . . ." (Italics added.) In return for release of the Ornamental Easement, Olivet and Cypress Abbey would enter into an agreement giving Olivet the right to drill a well within the area burdened by the easement. Wohlfeiler stated he believed his letter "accurately and completely set[] forth the agreement reached on January 8," but he invited Kallgren to identify any inaccuracies.

Kallgren responded to Wohlfeiler's letter on January 12, stating, "The agreement respecting the [Ornamental Easement] was and is separate and independent of our agreements respecting the 2.11 acres," and insisting the proposal be modified to reflect that. On January 19, Wohlfeiler replied with a revised letter agreement incorporating Kallgren's suggestions. While it stated that the agreement regarding the Ornamental Easement was "separate and independent" and "not in any respect contingent upon any term or provision relating to the purchase and sale of" the 2.11 acres, it reiterated that Olivet and Cypress Abbey had agreed Olivet would release the Ornamental Easement. This proposed agreement was not signed by the parties. Instead, Olivet and Cypress Abbey executed an agreement drafted by Kallgren addressing only the sale of the 2.11-acre parcel. In a January 22, 1998 letter to Kallgren returning the signed copy of that agreement, Wohlfeiler wrote that he expected Olivet to continue to discuss the well agreement "so that Olivet's release of the [Ornamental Easement] can be consummated in due course."

Although Olivet and Cypress Abbey had settled upon the purchase price for the 2.11 acres in January 1998, the sale of the parcel did not close until September 29 of that year, because they disputed what they had agreed to regarding the other issues discussed at the meeting. Kallgren testified that at the January 8, 1998 meeting, he had reached only a "gentleman's agreement" with Cypress Abbey regarding Olivet's release of the Ornamental Easement. Kallgren later insisted that the agreement to release the Ornamental Easement had not been finalized and that there was no linkage between that agreement and Cypress Abbey's sale of the 2.11 acres. Cypress Abbey, on the other hand, viewed the matter differently. It contended Olivet had agreed at the meeting to release the Ornamental Easement to Cypress Abbey and Cypress

Abbey had only assented to the sale of the 2.11 acres in reliance upon Olivet's agreement to relinquish the Ornamental Easement.

On March 19, 1998, Olivet and SCI executed a letter of intent regarding SCI's purchase of Olivet's assets. During the negotiations between the two entities, Kallgren did not tell SCI that he had reached an agreement to relinquish the Ornamental Easement to Cypress Abbey. Instead, he told SCI's Kirkpatrick there was no legally binding agreement, but rather only an agreement to negotiate further with Cypress Abbey on the issue. He also did not tell SCI that there were questions about the enforceability of the Option Agreement.

### The Asset Purchase Agreement and Closing of the Sale

On July 16, 1998, Olivet and SCI executed an asset purchase agreement (APA) for the sale of Olivet's cemetery business to SCI. SCI paid a lump sum of $11 million for the assets provided for in the APA. In return for the purchase price, in addition to other assets, SCI acquired from Olivet "all right, title and interest" in the "real property located at 1601 Hillside Boulevard, Colma, California." The Ornamental Easement was included among the real property interests transferred to SCI pursuant to the APA. Also among the assets was "the real property Option Agreement."

Article VI of the APA contained a number of postclosing covenants. Section 6.4 of the APA confirmed that the Option Agreement was among the assets SCI was acquiring. That section also stated: "[Olivet] has exercised the option pursuant to the Option Agreement to purchase approximately 2.11 acres. . . . Immediately following the Closing, [SCI] shall exercise the Option Agreement with respect to the remaining acreage thereunder by executing and delivering to Cypress Abbey . . . a notice of exercise in the form of the exercise letter attached hereto as Exhibit E . . . . [SCI] and [Olivet] shall use their reasonable efforts to negotiate the lowest purchase price possible in connection with such transaction, which negotiation shall be conducted on an arm's length basis independent of any other factors or transactions."

The sale of Olivet's assets was scheduled to close in late September 1998. But because of its disagreement with Olivet concerning the negotiations over the Ornamental Easement, Cypress Abbey refused to complete the agreed-upon sale of the 2.11 acres, and SCI was unwilling to go forward with the purchase of Olivet's assets unless the additional acreage was included. At Olivet's request, SCI's Kirkpatrick confirmed to Cypress Abbey's counsel that, within 20 days of closing of SCI's purchase of Olivet's assets, SCI would be "willing to negotiate in good faith" with Cypress Abbey regarding the release of the Ornamental Easement. After Olivet threatened to seek

damages from Cypress Abbey if it failed to complete the sale, Cypress Abbey relented and executed the necessary sale documents. The sale of Olivet's assets closed on September 30, 1998.[5]

Immediately prior to closing, Olivet had provided SCI with an updated schedule of all contracts to which Olivet was a party. One of the schedules included some correspondence from counsel for Cypress Abbey in which Cypress Abbey asserted its position that Olivet had already agreed to release the Ornamental Easement. While the schedules did include Olivet's agreement with Cypress Abbey for the purchase of the 2.11 acres, they did not include Wohlfeiler's letters of January 19 and 22, 1998, in which Cypress Abbey clearly took the position that Olivet had agreed to release the Ornamental Easement.

### SCI's Negotiations with Cypress Abbey

On October 1, 1998, SCI informed Cypress Abbey of its exercise of the option to buy the additional 8.71 acres. In December 1998, SCI vice-president Dann Narveson met with Cypress Abbey representatives to discuss the purchase. Narveson testified that the meeting "self-destructed" when Cypress Abbey made clear it was unwilling to discuss anything until SCI agreed to release the Ornamental Easement. Cypress Abbey's representatives told Narveson Olivet had already agreed to reconvey the Ornamental Easement prior to SCI's acquisition of Olivet's assets. The meeting ended abruptly after this announcement without any agreement on the option acreage.

Narveson then discussed the matter by phone with Kallgren, who told him there was no such agreement between Olivet and Cypress Abbey. On May 4, 1999, Narveson wrote to Kallgren requesting copies of earlier correspondence between Olivet and Cypress Abbey that had not previously been given to SCI. Kallgren responded the following day and provided Narveson with several documents, many of which had not been included in the schedules Olivet furnished to SCI as of the closing date. Among these documents were letters between Olivet and Cypress Abbey relating to the discussions surrounding the agreement they had reached on January 8, 1998, regarding the transfer of the 2.11-acre parcel and Cypress Abbey's understanding of the agreement with respect to the Ornamental Easement. Not included were Wohlfeiler's letters of January 9 and 19, 1998, in which Cypress Abbey asserted its position that Olivet had definitively agreed to release the Ornamental Easement.

---

[5] At some time after Olivet sold its cemetery assets to SCI, Olivet became a charity and changed its name to Five Bridges. From this point forward, we will refer to the entity as Five Bridges save when the context requires otherwise.

After Narveson consulted with Kallgren regarding the calculation of a price for the 8.71-acre parcel, on July 20, 1999, SCI offered Cypress Abbey $3.21 million for the land. Cypress Abbey did not respond to the offer. Counsel for SCI then wrote to Cypress Abbey demanding that it comply with the terms of the Option Agreement. Counsel for Cypress Abbey responded, disputing SCI's interpretation of the Option Agreement and asking SCI to confirm "whether it intend[ed] to promptly and unconditionally release the [Ornamental Easement]."

### *The* Cypress Abbey *Litigation*

On October 7, 1999, SCI sued Cypress Abbey in San Mateo Superior Court seeking declaratory relief and specific performance of the Option Agreement (the *Cypress Abbey* litigation). SCI asked the court to declare the purchase price for the remaining 8.71 acres under the terms of the Option Agreement, and it requested that the court order Cypress Abbey to transfer that acreage to SCI in return for the purchase price SCI had calculated. Cypress Abbey responded by filing a cross-complaint against SCI and Five Bridges. In its cross-complaint, Cypress Abbey asked the court to cancel the Option Agreement, quiet title to the 8.71 acres, and enforce specifically its earlier agreement with Olivet to reconvey the Ornamental Easement. It claimed that at the January 8, 1998 meeting, Olivet had entered into an enforceable oral contract to release the Ornamental Easement. Cypress Abbey asserted it had agreed to sell the 2.11-acre parcel at a reduced price in reliance on this oral agreement.

After faxing Cypress Abbey's cross-complaint to Kallgren, on January 28, 2000, SCI's counsel called Five Bridges's counsel to tender to Five Bridges the defense of Cypress Abbey's cross-complaint. Having received no response to the oral tender, counsel tendered the defense in writing. Five Bridges did not accept SCI's tender of defense and instead tendered its own defense of the *Cypress Abbey* litigation to SCI.

In May 2002, the court entered judgment in the *Cypress Abbey* litigation. The court found the Option Agreement provided no viable mechanism for determining a purchase price for the additional acreage and further ruled the Option Agreement was not specifically enforceable. It therefore entered judgment in favor of Cypress Abbey on SCI's claims. The court also found there was an enforceable oral agreement for reconveyance of the Ornamental Easement, and it ordered specific enforcement of that agreement. It also quieted title to the "Frontage Area" in Cypress Abbey's favor, extinguished the Ornamental Easement, and ordered Cypress Abbey to grant SCI a well easement.

## The Action Below

SCI filed this action on July 1, 2003. It later filed a first amended complaint (FAC) alleging 13 causes of action. A demurrer, various motions for summary adjudication, and a stipulation eliminated all but three of SCI's causes of action, leaving for trial its claims for breach of contract, unjust enrichment, and express contractual indemnity.

Five Bridges filed a cross-complaint asserting five causes of action, including declaratory relief, breach of contract, and unjust enrichment. In addition, it sought indemnification from SCI for the attorney fees and costs Five Bridges had incurred as a result of its involvement in the *Cypress Abbey* litigation. Prior to trial, the court below ruled that Five Bridges's claim for unjust enrichment was moot.

The action was tried to the court in March and April 2007. On October 16, 2007, the trial court announced its tentative decision in which it informed the parties that it would issue an amended tentative decision within 30 days. The amended tentative decision was not issued until almost a year later, on October 8, 2008. Both parties filed objections to the amended tentative decision and offered proposed findings to the court.

## The Final Statement of Decision

The trial court filed its final statement of decision on February 10, 2009. Regarding the Option Agreement, the court found SCI had assumed all risks as to its ability to negotiate with Cypress Abbey for additional land under that agreement. It therefore determined Five Bridges had not breached the APA with respect to the Option Agreement.

In contrast, the court found Five Bridges had breached the APA by failing to convey the Ornamental Easement to SCI. It made the following findings on this issue: Regardless of the terms of the Option Agreement, Cypress Abbey had only been willing to sell the 2.11-acre parcel to Olivet if Olivet would agree to reconvey the Ornamental Easement. Kallgren negotiated a swap of the Ornamental Easement in exchange for water rights but did not adequately disclose this agreement with Cypress Abbey in the APA. Specifically, although SCI knew Olivet was in negotiations with Cypress Abbey over the exchange of the Ornamental Easement for a well, SCI was affirmatively told there was no final agreement with Cypress Abbey at the time the APA was consummated. In addition, SCI was told Olivet was selling the Ornamental Easement to SCI as part of the APA. It was not fully disclosed to SCI that Olivet had had to promise release of the Ornamental Easement to get the 2.11 acres for the agreed price of $800,000. Finally, Olivet told Cypress Abbey

and SCI that it was up to them to finalize the negotiations for any swap of the Ornamental Easement *after* the close of the sale of Olivet's assets. The trial court criticized Kallgren's "lack of candor" in this regard.

This led to the breakdown of negotiations between SCI and Cypress Abbey over SCI's exercise of the option for the 8.71-acre parcel, because SCI assumed it was under no obligation to give up the Ornamental Easement and could use it as a bargaining chip in those negotiations. SCI did not know Olivet had already cashed in that bargaining chip to induce Cypress Abbey to sell the 2.11-acre parcel. Cypress Abbey, on the other hand, assumed it already had a deal to swap the Ornamental Easement for a water well, with only the details of the well rights left to be negotiated. As a result, SCI and Cypress Abbey were unable to reach agreement on a price for the 8.71 acres, and SCI sued to enforce the Option Agreement. The result of that action was a judgment ordering that the Ornamental Easement be deeded to Cypress Abbey. Thus, although the APA was clear that SCI was purchasing the Ornamental Easement, Olivet did not own the easement as it had already made an enforceable promise to convey it to Cypress Abbey.

The trial court also found Five Bridges had breached the express indemnity provisions of the APA by failing to assume defense of the cross-complaint in the *Cypress Abbey* litigation and by refusing to pay the amount of the resulting postjudgment settlement. The court awarded SCI no damages on this claim, however, because SCI had failed to segregate the fees expended in defense of Cypress Abbey's cross-complaint, which were subject to indemnity, from those expended in prosecuting its complaint against Cypress Abbey, which were not. The court rejected Five Bridges's claim that it was entitled to indemnity from SCI.

The court found SCI's claim for unjust enrichment either redundant or mooted by SCI's election to seek a remedy for breach of contract. Even if the claim had not been mooted, the trial court found that, to the extent Five Bridges was enriched, such enrichment was not unjust. Since it was awarding SCI damages for loss of the Ornamental Easement, it determined any damage award for unjust enrichment would be redundant.

After it rejected Five Bridges's affirmative defenses based on the statute of limitations and the limitations provisions of the APA, the trial court turned to the issue of damages. It noted SCI had presented expert evidence on the damages resulting from the failure to convey the Ornamental Easement, but Five Bridges had not. It applied the measure of damages prescribed by Civil

Code section 3300,[6] and relying upon the testimony of SCI's expert real estate appraiser, David Snively, concluded SCI suffered approximately $1.7 million in damages from loss of the Ornamental Easement. The court specifically considered the Ornamental Easement's potential value to SCI as a bargaining chip in its negotiations with Cypress Abbey. It noted the Ornamental Easement effectively precluded Cypress Abbey from making any use of its servient estate,[7] which meant that while the Ornamental Easement might have little value to others, its extinguishment was of great value to Cypress Abbey.

The trial court awarded SCI $1.7 million for breach of contract. It found there was no "non-prevailing party" within the meaning of the APA's attorney fee clause. It deemed SCI the prevailing party for purposes of statutory costs.

### Further Proceedings

Five Bridges filed further objections to the final statement of decision and asked the trial court to deem its final statement of decision a proposed statement of decision. The trial court denied the request and let stand its final statement of decision. The court entered judgment on July 6, 2009, awarding SCI damages of $1.7 million plus $290,417 in prejudgment interest, for a total of $1,990,417. The trial court denied Five Bridges's motion for new trial.

SCI moved for an award of attorney fees. After a hearing, the trial court denied SCI's motion.

Both parties filed appeals from the judgment. Five Bridges also appealed the denial of its motion for new trial.

### DISCUSSION

The parties challenge different aspects of the judgment. In its appeal, Five Bridges raises a host of issues. First, its principal argument is that SCI failed to introduce legally sufficient and substantial evidence of its damages. Second, Five Bridges claims it did not breach the APA by failing to transfer

---

[6] Civil Code section 3300 provides that in cases involving a breach of contract, "the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

[7] The property burdened by an easement is called the "servient estate," while the property to which the easement is appurtenant is called the "dominant estate." (*Blackmore v. Powell* (2007) 150 Cal.App.4th 1593, 1599 [59 Cal.Rptr.3d 527].)

the Ornamental Easement. Third, it asserts SCI's breach of contract claims were not timely filed. Fourth, Five Bridges challenges the trial court's finding in SCI's favor on the claim for express indemnity. Fifth, it asks us to modify the judgment to correct what it claims is a computational error. Sixth, it contends it was entitled to recover from SCI the expenses it incurred in the *Cypress Abbey* litigation.

For its part, SCI appeals from the trial court's denial of its request for attorney fees. It has also filed a conditional appeal of the trial court's summary adjudication of its claim for breach of express warranties.[8]

We first address the issues presented in Five Bridges's appeal. We then turn to SCI's appeal of the ruling on attorney fees.

## I. *SCI Introduced Legally Sufficient Proof of Its Damages*

Five Bridges argues it is entitled to judgment because SCI failed to prove any damages. In Five Bridges's view, the only proper measure of damages from the loss of an appurtenant easement is the diminution in value of the dominant estate served by that easement. Because SCI introduced no evidence valuing the Ornamental Easement under this methodology, Five Bridges asserts that SCI has not proved any damages. Five Bridges next contends that Snively's valuation testimony was inadmissible. Finally, Five Bridges argues that even if Snively's testimony was properly admitted, it does not constitute substantial evidence to support the judgment. We will address these arguments in turn.

### A. *Standard of Review*

Our review of the trial court's damage award proceeds in two steps. "[W]e first consider the legal measure of damages to be awarded. We then turn to the proper way to determine the value of the elements considered in that measure." (*New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 843 [114 Cal.Rptr.3d 504] (*New West*).) Where there is more than one legally permissible measure of damages, the trial court's choice of a particular measure under the specific circumstances of the case is a matter of discretion. (*Ibid.*, citing *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873 [274 Cal.Rptr. 168] (*GHK*).) On

---

[8] SCI states in its brief that it has filed this conditional appeal only to preserve its right in the event of reversal of the judgment but will withdraw its appeal from this order if we affirm the judgment. Because we affirm the judgment in SCI's favor and reverse only the trial court's denial of attorney fees to SCI, we will treat SCI's conditional appeal as withdrawn and will not address it. SCI has also withdrawn its appeal from the trial court's order granting two other motions for summary adjudication and from the trial court's ruling on a motion for reconsideration.

the other hand, "whether a certain measure of damages is permissible given the legal right the defendant has breached, is a matter of law, subject to de novo review. [Citation.]" (*New West*, at p. 843.)

Here, the parties agree Civil Code section 3300 provides the proper legal measure of damages. Thus, assuming it breached the APA by failing to convey the Ornamental Easement, Five Bridges does not dispute that SCI "should receive as nearly as possible the equivalent of the benefits of performance." (*Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455 [277 Cal.Rptr. 40] (*Brandon & Tibbs*).) The parties' disagreement concerns how to quantify those benefits. Five Bridges contends the only legally permissible way to calculate the benefits SCI would have received from the promised performance is to determine the diminution in value to the dominant cemetery estate caused by the loss of the Ornamental Easement. We review this contention de novo. (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691 [21 Cal.Rptr.3d 732] [whether plaintiff is entitled to recover lost wages under promissory estoppel theory is question of law subject to de novo review].) We review for abuse of discretion the trial court's selection of the basis on which to compute SCI's damages. (See *GHK, supra*, 224 Cal.App.3d at pp. 873–874.) Five Bridges's claims that the evidence was insufficient to sustain the damage award are subject to substantial evidence review. (*Id.* at p. 873.)

### B. *Five Bridges Has Forfeited Its Objection to Snively's Methodology*

SCI initially contends that Five Bridges has forfeited its right to object to Snively's opinion on the grounds it raises on appeal. SCI points out that Five Bridges filed a motion in limine to exclude Snively's testimony on three different grounds, but it did not present to the trial court the objection it raises in this court.[9]

We agree that Five Bridges has forfeited this challenge by failing to make an objection below that satisfies the requirements of Evidence Code section 353.[10] At no time before or during trial did Five Bridges argue that the only proper measure of damages for the loss of an appurtenant easement was the diminution in value to the dominant estate. In fact, this argument was first

---

[9] Below, Five Bridges argued Snively's testimony should be excluded because (1) SCI had improperly instructed him not to answer questions at his deposition; (2) his testimony was too subjective to assist the trier of fact; and (3) his testimony was not relevant as it pertained only to damages, and SCI could not establish a prima facie case of liability.

[10] Evidence Code section 353 provides in relevant part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ."

articulated in Five Bridges's request for a statement of decision, which it filed in November 2008, almost a year and a half after the conclusion of trial. Five Bridges cites one instance in which it objected during trial, but in that case it simply attacked Snively's testimony as irrelevant and "speculative." It also quotes a sentence from its *posttrial* brief in which it argued Snively's opinion had "no support in logic, precedent, custom or practice," but this phrase appeared under a heading that again claimed the opinion was too speculative to support an award of damages.

We conclude Five Bridges's objections did not satisfy the requirements of Evidence Code section 353 because they were neither timely nor sufficiently specific. Five Bridges's objection that Snively had employed a legally impermissible methodology was first made more than a year after the close of the evidence and thus was far too late to be timely. (See *Mosesian v. Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 865 [236 Cal.Rptr. 778] [hearsay objection to expert's opinion untimely where made as motion for mistrial after the expert finished testifying]; *Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 658–660 [151 Cal.Rptr. 399] [objection to expert testimony untimely where made after expert had finished testifying]; *San Bernardino County Flood Control Dist. v. Sweet* (1967) 255 Cal.App.2d 889, 901 [63 Cal.Rptr. 640] (*Sweet*) [plaintiff forfeited objection to admittedly improper testimony of valuation witness where plaintiff did not move to strike testimony until after witness was cross-examined].) Had Five Bridges raised its current objection in either its motion in limine or at trial, SCI would have had the opportunity to meet that objection by attempting to correct the alleged infirmity. (See *Rodriguez*, at p. 660.) Permitting Five Bridges to raise this objection at the eleventh hour would be fundamentally unfair to SCI.

Moreover, the objections Five Bridges *did* make prior to trial and during Snively's testimony did not include the ground Five Bridges now argues on appeal. As the California Supreme Court has explained, "[a]n objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent *cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later* in a motion to strike stating specific or different grounds." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22 [45 Cal.Rptr.3d 407, 137 P.3d 229], italics added; see *id.* at pp. 21–22 [objection that testimony lacked foundation, was speculative, or was nonresponsive insufficient to preserve for appeal claim that testimony constituted improper character evidence].) Five Bridges's objections that Snively's testimony was speculative and irrelevant did not encompass its present claim that Snively employed a legally improper methodology for valuing the Ornamental Easement. (See *People v. Mills* (2010) 48 Cal.4th 158, 206–207 [106 Cal.Rptr.3d 153, 226 P.3d 276] [defendant forfeited objection to admission of exhibits where he objected generally but did not raise specific concerns presented on appeal]; *People v.*

*Polk* (2010) 190 Cal.App.4th 1183, 1194 [118 Cal.Rptr.3d 876] [defendant forfeited objection to substantive adequacy of *Miranda* warnings although she had raised other objections based on *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]].) As a result, Five Bridges cannot now contest the admissibility of Snively's testimony on this ground because at trial it failed to state this ground in support of its objection.[11] (*Mosesian v. Pennwalt Corp., supra*, 191 Cal.App.3d at p. 865.)

Finally, we note that Kallgren's own testimony on the value of the Ornamental Easement was not phrased in terms of the diminution in value of Olivet's dominant cemetery estate. Kallgren claimed the Ornamental Easement was a "white elephant" because it imposed a burden for maintenance and was not serving any particularly useful purpose. When Five Bridges's counsel asked Kallgren to express an opinion on the value of the Ornamental Easement, he asked for its value "in dollars" and not in terms of "value to the business." It does not appear Kallgren was ever asked specifically how the presence or absence of the Ornamental Easement affected the value of the dominant estate. Thus, the testimony of Five Bridges's own witness was inconsistent with the measure of damages it now contends should have been applied. This reinforces our conclusion that Five Bridges failed to make a timely and specific objection to Snively's valuation methodology.

## C. *The Cases upon Which Five Bridges Relies Are Not Controlling*

Even if Five Bridges had properly preserved its objection to Snively's methodology, we would find it unpersuasive. Citing cases involving the condemnation of access and water supply easements, Five Bridges argues the *only* proper way to determine the value of the loss of the Ornamental Easement is to assess the diminution in the value of the dominant estate caused by that loss. The trial court distinguished these cases on their facts, because they generally involve "an easement for the right to pass over the land of another or have water travel over the land of another." (See *Harman v. City and County of San Francisco* (1972) 7 Cal.3d 150, 167 [101 Cal.Rptr. 880, 496 P.2d 1248] (*Harman*) [easements of ingress and egress;

---

[11] None of the cases Five Bridges cites supports the argument that its objections were sufficiently timely and specific. (See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1055–1056 [90 Cal.Rptr.2d 607, 988 P.2d 531] [propriety of defendant's impeachment with prior convictions preserved for appeal where defendant objected to the use of the convictions at pretrial hearing]; *People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1570 [90 Cal.Rptr.3d 644] [trial court responded to objections to statement of decision; Evid. Code, § 353 not at issue]; *Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950–954 [88 Cal.Rptr.3d 707] [court held objection to expert testimony not forfeited but reviewed *only* objections raised in motion in limine].) Five Bridges has produced no case in which a court has permitted a party to raise on appeal an objection to expert testimony made so long after the close of trial.

*Hemmerling v. Tomlev, Inc.* (1967) 67 Cal.2d 572, 575 [63 Cal.Rptr. 1, 432 P.2d 697] (*Hemmerling*) [easement to provide water for irrigation]; *Redevelopment Agency v. Tobriner* (1989) 215 Cal.App.3d 1087, 1091 [264 Cal.Rptr. 481] (*Tobriner*) [parking and ingress and egress easement]; *People ex rel. Dept. of Public Works v. Logan* (1961) 198 Cal.App.2d 581, 586 [17 Cal.Rptr. 674] (*Logan*) [easement of ingress and egress].) In contrast, the Ornamental Easement does not require travel over another owner's property to obtain the benefit of the easement, and as the trial court found, the land burdened by the Ornamental Easement "does not physically touch the land owned by SCI." Five Bridges asserts that the purpose of the Ornamental Easement and the uses it permits are not a reason to depart from the valuation methodology used in eminent domain cases, but it does not tell us why the legal rule it advocates must *necessarily* apply outside of the eminent domain context. (Cf. *Meakin v. Steveland, Inc.* (1977) 68 Cal.App.3d 490, 503 [137 Cal.Rptr. 359] [rejecting use of measure of value used in condemnation cases where city's sale of public land was "more akin to any transaction negotiated between two private parties"]; see *id.* at pp. 502–504.)

■ We agree that in eminent domain cases, courts have measured the value of a condemned appurtenant easement by the diminution in the market value of the dominant estate caused by loss of the easement. (*Harman, supra*, 7 Cal.3d at p. 167; *Hemmerling, supra*, 67 Cal.2d at p. 575; *Tobriner, supra*, 215 Cal.App.3d at p. 1099; *Logan, supra*, 198 Cal.App.2d at p. 586.) Although we do not question the holdings of those cases, none of them suggests that no other legal measure of damages would be permissible in the very different factual context presented here. That courts have approved one method of proving a particular category of damages does not mean that no other method is permissible. (See *Pacific Scientific Co. v. Glassey* (1966) 245 Cal.App.2d 831, 842 [54 Cal.Rptr. 235] [actual sales are a proper basis, but not the only basis, for determining profits that would have been earned but for breach of distributorship contract].) And where, as here, the trial court must value an asset for which there is no relevant, comparable market, it may consider any valuation methodology that is just, equitable, and not inconsistent with California law. (*People ex rel. Dept. of Transportation v. Clauser/Wells Partnership* (2002) 95 Cal.App.4th 1066, 1082 [116 Cal.Rptr.2d 240]; Evid. Code, § 823.) ■ Because of these factual and legal distinctions, the cases Five Bridges cites would not be controlling even if Five Bridges had made a timely and specific objection to Snively's valuation methodology. (See, e.g., *American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1039 [56 Cal.Rptr.2d 109, 920 P.2d 1314] [" 'cases are not authority for propositions not considered' " therein].)

Moreover, the holdings of the cases upon which Five Bridges relies are less sweeping than claimed. For example, *Hemmerling, supra*, 67 Cal.2d 572, explained the compensation due to owners of a condemned water easement: "When, as in this case, the easements are appurtenant *and can be used only to provide water for irrigation of the dominant estates*, the value of each easement is the diminution in the market value of the dominant tenement caused by its loss. [Citations.]" (*Id.* at pp. 575–576, italics added.) The italicized language indicates the California Supreme Court concluded only that this measure of value was appropriate to the type of easement there at issue, not that this was the measure by which all appurtenant easements must be valued.

Five Bridges seeks support in the following sentence from *Harman, supra*, 7 Cal.3d at page 167: "Modern appraisal practice dictates that the value of an easement be determined by comparing the market value of the dominant estates before and after the easement is terminated." In the very next sentence, however, the court explained that " '[t]he general rule is that the [value] of *access rights* is the difference in the market value of the [abutting] property before the taking of the access rights and its market value after the taking, considering its highest and best use. . . .' [Citations.]" (*Ibid.*, italics added.) By referring to the appraisal practice used to value access easements, *Harman* did not purport to establish an invariable rule for the valuation of all appurtenant easements regardless of their nature.[12] (Cf. 7 Cal.3d at p. 168 [in selling vacated streets, city "must recognize and compensate for the *variation in easement values* that result from the divergent 'highest and best uses' of the [abutting] parcels"].)

Equally inapposite here is *Tobriner, supra*, 215 Cal.App.3d 1087. In that case, Division Three of this court explained the rationale underlying the rule that the value of a condemned appurtenant easement is determined "through the measurement of the value of the dominant tenement before and after the taking." (*Id.* at p. 1101, fn. 9.) This measurement is used in condemnation cases because "[a]ppurtenant easements have no use or value apart from the dominant tenements the easements were created to serve; there can be no market for such easements apart from the dominant tenement." (*Ibid.*) The reason there is generally no market for appurtenant easements is because they

---

[12] Indeed, the proper method for determining the value of an appurtenant easement was not the central issue in *Harman*. Rather, the court was asked to resolve whether the City and County of San Francisco's practice of valuing all easements of ingress and egress at 50 percent of the unencumbered fee value violated a provision of the San Francisco Charter requiring the city to obtain 90 percent of the rationally determined market value of all public property offered for sale. (*Harman, supra*, 7 Cal.3d at pp. 155, 165–169.)

may not be severed from the dominant estate and transferred separately from it. (*Leggio v. Haggerty* (1965) 231 Cal.App.2d 873, 880 [42 Cal.Rptr. 400].) They may, however, be released to the owner of the servient estate, and such a conveyance extinguishes the easement. (*Ibid.*) In this case, the claimed value of the Ornamental Easement was as an asset that could be sold or traded to Cypress Abbey. *Tobriner* simply did not consider the measure of damages that might be appropriate for breach of a contract to convey an easement having demonstrable value as an asset to be sold or traded to the owner of the servient estate.

### D. Compensatory Damages for the Loss of the Ornamental Easement

Five Bridges contends the trial court's task in assessing damages was "to determine whether any damages were caused by the failure to convey one asset"—the Ornamental Easement. With this much, we agree. Five Bridges's argument, however, ignores the damage theories SCI presented and the evidence concerning the value of the Ornamental Easement. Before we address Five Bridges's other challenges to Snively's testimony, it is helpful to understand what damages SCI sought below and the losses for which the damages were intended to compensate.

#### 1. The Value of the Ornamental Easement Was a Question of Fact for the Trial Court to Resolve

At trial, SCI contended Five Bridges's failure to transfer the Ornamental Easement deprived SCI of both the signage rights and of the Ornamental Easement's value as a "bargaining chip" in negotiating with Cypress Abbey for acquisition of additional cemetery acreage.[13] Witnesses for both parties testified that the Ornamental Easement had value for advertising and for negotiating with Cypress Abbey. On the first point, Narveson stated the Ornamental Easement was valuable because it gave SCI signage rights on Cypress Abbey's property. Kallgren himself admitted the easement "added some value as to visibility."

---

[13] Five Bridges's assertion that SCI never raised the bargaining chip theory at trial is flatly contradicted by the record. In his opening statement, SCI's counsel said that the Ornamental Easement had value to his client as a bargaining chip—the very words he chose—to be used in negotiations with Cypress Abbey. Counsel raised the theory again in arguments to the court during trial. SCI relied on the bargaining chip theory in its closing trial brief, referring to the Ornamental Easement's value as a *"bargaining lever* in dealing with [Cypress Abbey]" and contending "the [Ornamental] Easement had both substantial monetary and *leverage value* to [Cypress Abbey] and, in turn, to the holder of the [Ornamental] Easement." (Italics added.) Thus, SCI unquestionably presented the bargaining chip theory below. (Cf. *People v. Bunyard* (1988) 45 Cal.3d 1189, 1216 [249 Cal.Rptr. 71, 756 P.2d 795] [finding "strong indication" of party's theory in closing argument].)

On the second point, Narveson explained that the Ornamental Easement had value because it prevented Cypress Abbey from making use of the underlying land, which, as Kallgren acknowledged, gave Cypress Abbey a keen interest in reconveyance of the easement so its servient property could be developed. Both Narveson and Kallgren testified to the Ornamental Easement's value as an asset that could be traded to Cypress Abbey. While Kallgren claimed the Ornamental Easement was valuable only as a means of procuring an alternate site for a water well, his testimony clearly indicates his recognition that the easement could be used as a bargaining chip.[14] He testified he "was not interested in extracting a lot of money from [Cypress Abbey] for this property" but only because "[i]t was not consistent with [Olivet's] relationship with Cypress Abbey."

Five Bridges thus acknowledges that the Ornamental Easement had *some value* as an asset that could be sold or traded to Cypress Abbey. In Five Bridges's view, that value was as an item to be exchanged for the right to place a water well on Cypress Abbey's property. But if Five Bridges concedes the Ornamental Easement could be exchanged for the right to a water well, then it cannot dispute the basic premise that the Ornamental Easement had value as a bargaining chip. Five Bridges's failure to convey the easement to SCI therefore deprived SCI of that asset. The only remaining question was the value of the asset that was not conveyed.

Five Bridges presented no expert testimony on this issue. It points instead to Kallgren's testimony that the Ornamental Easement was of negligible value and argues SCI therefore suffered no damage from the loss of the Ornamental Easement. This argument is unquestionably a factual one, and to accept it, we would be required to reweigh the evidence and reverse the trial court's factual findings. (*GHK, supra,* 224 Cal.App.3d at p. 874.) Once the trial court found SCI had been damaged by the breach, and ruled that Civil Code section 3300 provided the measure of those damages, only the amount of the damages remained to be calculated. (*GHK,* at p. 873.) This was an issue of fact for the trial court to resolve. (*Id.* at p. 874.)

---

[14] At oral argument, counsel for Five Bridges conceded that one element of the value of the Ornamental Easement was that it could be sold or reconveyed to Cypress Abbey. Like Kallgren, counsel asserted this element was worth only the cost of a water easement. Nevertheless, counsel agreed the court was entitled to credit SCI with the bargaining chip value of the Ornamental Easement, although he disputed the basis for calculating that value and argued there was no evidence in the record suggesting the easement could be used as a bargaining chip for anything other than a water well.

### 2. *The Trial Court's Method of Computing SCI's Damages Was Reasonable*

■ The trial court sought to quantify all the damages proximately caused by Five Bridges's failure to convey the Ornamental Easement. (Civ. Code, § 3300.)[15] The purpose of the damage award was to put SCI "in as good a position as [it] would have been had performance been rendered as promised." (*Brandon & Tibbs, supra,* 226 Cal.App.3d at p. 455.) Because this goal can never be exactly attained, the rules governing recovery of contract damages are flexible and " 'leav[e] much to the individual feeling of the court created by the special circumstances of the particular case.' [Citation.]" (*Ibid.*) Damages cannot be calculated with absolute certainty, and California law "requires only that some reasonable basis of computation . . . be used, and the damages may be computed even if the result reached is an approximation." (*GHK, supra,* 224 Cal.App.3d at p. 873.)

In this case, the trial court faced challenges in computing the amount of SCI's damages. It had no purchase price upon which to base its award because the APA did not denominate the value of the Ornamental Easement and because the judgment in the *Cypress Abbey* litigation gave the easement to Cypress Abbey and well rights to SCI. In addition, because of the unique nature of the Ornamental Easement, the trial court also could not rely on more typical guideposts such as sales of comparable property interests. (See Clarke, *Easement and Partial Taking Valuation Problems* (1969) 20 Hastings L.J. 517, 520 [noting difficulty of finding market transactions with which to value easements].) The trial court therefore turned to alternate means of valuing what SCI lost as a result of Five Bridges's breach of the APA.

As Five Bridges points out, SCI does not attempt to justify the trial court's damage award on the basis of the Ornamental Easement's signage value. Similarly, while the trial court mentioned Snively's opinion that it would cost SCI between $1.74 million and $2.06 million to obtain an alternate site for signage, it focused principally on the value of the Ornamental Easement as an asset to be sold or conveyed to Cypress Abbey.[16] Neither side disputes

---

[15] The trial court recognized that the APA was an agreement for the purchase of an entire business, albeit one that included real estate among its assets. In determining the damages for breach of such an agreement, "any limited measure of damages exclusively applicable to the sale of goods or the sale of an interest in real property should not govern . . . but, rather, the general rule prescribed by Civil Code, section 3300, as limited by Civil Code, section 3358, should be applied." (*Wickman v. Opper* (1961) 188 Cal.App.2d 129, 132 [10 Cal.Rptr. 291].)

[16] Because the trial court did not base its damage award on the cost of replacing the signage rights provided by the Ornamental Easement, and SCI does not defend the award on these grounds, we need not address the validity of that measure. We note that Five Bridges does not contend in its briefing that the trial court's determination of damages was tainted by the

Cypress Abbey's desire for reconveyance of the Ornamental Easement. The trial court found that Five Bridges knew the Ornamental Easement was of great value to Cypress Abbey and was of great value to SCI in its ability to negotiate the purchase of additional acreage from Cypress Abbey. To estimate this value, the court looked at how much more Cypress Abbey's servient property would be worth if it were unencumbered and could be developed for commercial purposes. It referred to Snively's appraisal, which estimated that without the Ornamental Easement, Cypress Abbey's servient property would have been worth $2.66 million as of October 1, 1998, and $4.07 million as of July 28, 2000. In other words, the trial court sought to estimate how much Cypress Abbey would likely have paid for relinquishment of the Ornamental Easement in order to determine the easement's value to SCI.

The trial court ultimately chose to use "the more conservative numbers presented," basing its award on "the lower appraisal value of $1.74 million" and subtracting an estimated value of the water well rights SCI received from Cypress Abbey. The necessarily approximate nature of these figures does not invalidate the court's calculation. (See *GHK, supra,* 224 Cal.App.3d at p. 873.) Five Bridges cannot escape liability for its breach merely because SCI's damages cannot be measured exactly. (*Brandon & Tibbs, supra,* 226 Cal.App.3d at p. 458.) And it has not "demonstrated that this application by the trial court of what was essentially a conservative measure of damages was an abuse of discretion." (*GHK,* at p. 874.)

 The trial court properly considered Cypress Abbey's unique desire for reconveyance of the Ornamental Easement in calculating the amount of damages. Where a particular buyer has a special need for property the buyer does not presently own, the value of the property to that buyer is a factor that may be considered in determining the fair market value of the property, even if no one else shares that buyer's peculiar position. (See Bogdanski, Federal Tax Valuation (2011 supp. No. 1) ¶ 2.01[2][c][iii], p. 2-32.) Thus, in a case in which a landowner (Smith) wished to develop his land for industrial purposes and purchased adjoining property uniquely situated to meet his need for rail and road access, the court held the properties purchased "were therefore worth more to Smith than they would have been to a purchaser who did not own adjoining land that he wanted to put to use in a way that would fully utilize the rail line and road that they provided access to." (*Serdar v. Commissioner* (1986) T.C. Memo 1986-504, 52 T.C.M. (CCH) 750, 755.) The fair market value of the properties therefore equaled the value of the

admission of evidence of the replacement cost of the signage rights. Instead, as its reply brief makes clear, Five Bridges argues that the bargaining chip theory of damages, which is the sole support for the verdict, fails.

consideration Smith paid for them, even though the consideration was almost 10 times the value an appraiser had placed on the properties. (*Id.* at pp. 754, 755.)[17]

█ In this case, extinguishing the Ornamental Easement had great value to Cypress Abbey. The easement prohibited Cypress Abbey from making any use of the surface of the burdened parcels and thus prevented Cypress Abbey from developing them for commercial purposes, which was their highest and best use. Since the Ornamental Easement gave its holder the exclusive right to use the surface of the land, it took "essentially the entire fee interest, leaving the owner of the fee with only a nominal value or right of reverter. [Citation.]" (*County Sanitation Dist. v. Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1280 [22 Cal.Rptr.2d 117].) Thus, while the Ornamental Easement may not have had great value to another hypothetical buyer or even to the dominant estate, this did not diminish its potential value to Cypress Abbey. (Cf. *Tobriner, supra,* 215 Cal.App.3d at p. 1099, fn. 7 [noting that there is little relationship between the economic value of an easement to its owner and the reduction in value it may cause to the servient estate].) Freed from the restrictions of the Ornamental Easement, Cypress Abbey's servient property would be adaptable to more profitable commercial use. This made the Ornamental Easement uniquely valuable to Cypress Abbey, and both this unique value and the potential uses to which the unencumbered property could be put were proper factors to consider in determining what Cypress Abbey might have paid SCI for reconveyance of the Ornamental Easement. (See *Ventura County Flood Control Dist. v. Security First Nat. Bank* (1971) 15 Cal.App.3d 996, 1002 [93 Cal.Rptr. 653]; *Serdar v. Commissioner, supra,* 52 T.C.M. (CCH) at p. 755.)

### 3. *Civil Code Section 3355*

█ In awarding damages, the trial court also relied on Civil Code section 3355, which states: "Where certain property has a peculiar value to a person recovering damages for deprivation thereof, or injury thereto, that may be deemed to be its value against one who had notice thereof before incurring a liability to damages in respect thereof, or against a willful wrongdoer." The court found Five Bridges knew the Ornamental Easement was of great value to SCI in its ability to negotiate the purchase of additional acreage from

---

[17] The same rule applies to the valuation of property other than land. One company may pay a much higher price to buy another company if the acquired company "fills a need or goal unique to that buyer." (*Lawton v. Nyman* (D.R.I. 2005) 357 F.Supp.2d 428, 431–432, fn. 2 [explaining that a company's "[s]trategic value is the investment value a company may have to a particular prospective buyer because it fills a need or goal unique to that buyer" and that strategic value "ordinarily will be greater than what otherwise would be the company's market value to non-strategic buyers"]; see also *Perlman v. Feldmann* (2d Cir. 1955) 219 F.2d 173, 175 [purchasers of controlling shares in steel corporation paid premium for stock because of purchasers' particular need to secure supply of steel during shortage caused by Korean War].)

Cypress Abbey.[18] Under Civil Code section 3355, a plaintiff must prove (1) the property at issue had a peculiar value to the plaintiff and (2) the defendant knew of such peculiar value prior to incurring liability for damages. (*King v. Karpe* (1959) 170 Cal.App.2d 344, 348–349 [338 P.2d 979] (*King*).) SCI presented proof of both elements, and thus damages could properly be assessed in accordance with this section.

As to the first element, the record contains evidence of the Ornamental Easement's "unique economic value" to SCI. (*McMahon v. Craig* (2009) 176 Cal.App.4th 1502, 1518 [97 Cal.Rptr.3d 555] [peculiar value under Civ. Code, § 3355 is property's unique economic value].) In entering into the APA, a crucial consideration for SCI was its ability to acquire additional cemetery acreage from Cypress Abbey. It would not have purchased Olivet's assets if those assets had not included the option to acquire additional land for graves. Cypress Abbey very much desired reconveyance of the Ornamental Easement, and Kallgren had used it in his negotiations for the sale of the 2.11-acre parcel. The easement was therefore uniquely valuable as an asset in negotiating with Cypress Abbey for the purchase of the additional acreage SCI needed to operate the cemetery profitably. (See *King, supra,* 170 Cal.App.2d at p. 349 [testimony that registered Hereford cow produced outstanding offspring and that plaintiff needed this type of stock to build up her herd was evidence of peculiar value].)

There also can be little doubt Five Bridges was aware of the peculiar value of the Ornamental Easement before it incurred liability for damages for breach of the APA. (See *King, supra,* 170 Cal.App.2d at p. 349.) Kallgren knew Cypress Abbey wanted the Ornamental Easement reconveyed, and he was aware that reconveyance would make Cypress Abbey's land more valuable because property on El Camino Real had potential value for development. Kallgren himself had used the promise to reconvey the Ornamental Easement to induce Cypress Abbey to offer a better price for the 2.11-acre parcel. This evidence sufficed to show Five Bridges's knowledge of the Ornamental Easement's peculiar value. (See *ibid.* [defendant's knowledge of cow's value shown by his experience as expert breeder and his decision to take half interest in cow's offspring].) Under these circumstances, the trial court could properly award the damages proximately flowing from Five Bridges's breach. (*Artists' Embassy v. Hunt* (1958) 157 Cal.App.2d 371, 374

---

[18] In its reply brief, Five Bridges argues that Civil Code section 3355 does not apply to this case. Five Bridges has abandoned any challenge to the trial court's reliance on this section by failing to raise the matter in its opening brief. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 [43 Cal.Rptr.3d 148]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 723, p. 790 ["Obvious considerations of fairness in argument demand that the appellant present all of his or her points in the opening brief."].) An appellant cannot salvage a forfeited argument by belatedly addressing the argument in its reply brief. (*Paulus v. Bob Lynch Ford, Inc.,* at p. 685.)

[320 P.2d 924] [common carrier that failed to deliver theatrical properties in time for play's performance held liable for rental of theater for missed performance, house costs, and portion of weekly operating costs].)

E., F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VII. *The Attorney Fee Order*

In its cross-appeal, SCI challenges the trial court's denial of its motion for attorney fees. It claims that as the prevailing party in an action on a contract providing for recovery of attorney fees, it is entitled to an award of reasonable attorney fees under Civil Code section 1717. It also argues it is entitled to attorney fees under Code of Civil Procedure section 998, subdivision (d).[26] We conclude that the trial court did not abuse its discretion in denying SCI attorney fees under Civil Code section 1717. We agree, however, that SCI is entitled to an award of fees under section 998(d).

### A. *The APA's Attorney Fee Provision and the Trial Court's Ruling*

Section 11.4 of the APA provides: "In the event of any controversy, claim or dispute between or among any of the parties hereto arising out of or relating to this Agreement, or any default or breach or alleged default or breach hereof, the non-prevailing party shall pay all attorney's fees, costs and expenses associated with any such action." In its statement of decision, the trial court found both parties had prevailed on "material issues and claims in this lawsuit," and it ruled that there was "no 'non-prevailing party' " under the terms of the APA. It therefore refused to award any contractual fees or costs under section 11.4. Nevertheless, the trial court deemed SCI the prevailing party under section 1032, subdivision (a)(4), entitling SCI to an award of statutory costs pursuant to sections 1032, subdivision (b) and 1033.5. The court noted SCI had indicated its intention to seek an award of fees and costs pursuant to section 998 but had not presented the issue "for adjudication pre-judgment."

---

*See footnote, *ante*, page 549.

[26] Hereafter, all undesignated section references are to the Code of Civil Procedure. All references to section 998, subdivision (d) will be styled as section 998(d).

After the trial court entered judgment, SCI moved for an award of attorney fees, costs, and expert witness fees. It argued it was the party prevailing on the contract, and thus Civil Code section 1717 entitled it to an award of the attorney fees incurred in litigating its contract claim. In the alternative, SCI contended it was entitled to an award of attorney fees under section 998(d), because the trial court had awarded it damages exceeding its pretrial settlement offer to Five Bridges. SCI therefore requested an award of its postoffer attorney fees.

The trial court denied SCI's requests for attorney fees pursuant to both contract and statute. Citing section 998, it granted SCI's request for an award of the expert witness fees incurred after SCI had made its settlement offer.

B. *Attorney Fees Under Civil Code Section 1717*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *The Trial Court Erred in Denying SCI's Request for Attorney Fees Under Section 998*

Prior to trial, SCI offered to settle the action against Five Bridges in exchange for a payment of $799,000. Five Bridges did not accept this offer, and SCI subsequently recovered damages exceeding that amount. The trial court specifically found SCI met the definition of "prevailing party" in section 1032, subdivision (a)(4) and was therefore entitled to an award of statutory costs pursuant to sections 1032, subdivision (b) and 1033.5. Accordingly, relying on section 998, the court later awarded SCI its postoffer expert witness fees. On appeal, SCI argues it was also entitled to recover its postoffer attorney fees under section 998(d).[30]

Five Bridges contests SCI's entitlement to fees on two grounds. First, Five Bridges interprets section 998(d) to provide that expert witness fees are the only item of postoffer costs a plaintiff may recover. In other words, Five Bridges asserts that section 998 simply does not authorize an award of attorney fees as costs to a plaintiff whose settlement offer is not accepted and who then recovers a judgment that exceeds the amount of the offer. Five

---

[*]See footnote, *ante,* page 549.

[30] Section 998(d) provides: "If an offer made by a plaintiff is not accepted and the defendant fails to obtain a more favorable judgment or award in any action or proceeding other than an eminent domain action, the court or arbitrator, in its discretion, may require the defendant to pay a reasonable sum to cover postoffer costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the plaintiff, in addition to plaintiff's costs."

Bridges contends that only defendants may recover attorney fees under section 998. In addition, Five Bridges contends attorney fees are unavailable because SCI has no right to them under either the language of the APA or Civil Code section 1717. Five Bridges is wrong on both counts.

### 1. *Plaintiffs May Recover Attorney Fees as Costs Under Section 998(d)*

"Section 1032 is the fundamental authority for awarding costs in civil actions." (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1108 [86 Cal.Rptr.2d 614, 979 P.2d 974] (*Scott*).) Under that section, "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (§ 1032, subd. (b).) As the trial court properly concluded, SCI was a prevailing party within the meaning of this provision, because in this action it was "the party with a net monetary recovery." (§ 1032, subd. (a)(4).) The costs recoverable by prevailing parties, such as SCI, are specified in section 1033.5, which includes among the "items . . . allowable as costs under Section 1032" "[a]ttorney's fees, when authorized by . . . [¶] [c]ontract." (§ 1033.5, subd. (a)(10)(A).) Thus, contrary to Five Bridges's interpretation of the statute, the costs referred to in section 998 are those set forth in section 1032, and those costs include attorney fees when authorized by contract. (§ 1033.5, subd. (a)(10)(A); *Scott, supra,* at pp. 1112–1113; *Stallman v. Bell* (1991) 235 Cal.App.3d 740, 744, fn. 3 [286 Cal.Rptr. 755].)

Here, SCI unquestionably obtained a judgment exceeding its pretrial settlement offer. Thus, SCI met the requirements of section 998, because "an offer made by a plaintiff [was] not accepted and the defendant fail[ed] to obtain a more favorable judgment." (§ 998(d).) Five Bridges suggests, however, that (1) only defendants, and not plaintiffs, may recover their postoffer attorney fees when they have made a settlement offer that is more favorable than the ultimate judgment obtained by their opponent, and (2) the sole item of costs to which plaintiffs may be entitled are expert witness fees. We disagree, because this interpretation of section 998 finds no support in either the language of the statute or the relevant case law.

Taking Five Bridges's second contention first, the plain language of section 998(d) grants the trial court discretion to award expert witness fees "*in addition to* plaintiff's costs." (Italics added.) This language creates an express exception to the general prohibition on the award of expert witness fees as costs. (See § 1033.5, subd. (b)(1) [listing the "[f]ees of experts not ordered by the court" among the "items . . . not allowable as costs, except when expressly authorized by law"].) The wording of section 998(d) makes clear that expert witness fees are an *additional* item of costs awardable to a

plaintiff under that provision. They therefore are not the *sole* item of costs available to a plaintiff that recovers a judgment exceeding its pretrial settlement offer.

Case law strongly supports this reading. The California Supreme Court has held that "[t]here is no sound basis under section 998 for distinguishing attorney fees from other categories of costs . . . ." (*Scott, supra,* 20 Cal.4th at p. 1114.) Indeed, in *Pilimai v. Farmers Ins. Exchange Co.* (2006) 39 Cal.4th 133 [45 Cal.Rptr.3d 760, 137 P.3d 939] (*Pilimai*)—a case Five Bridges fails to cite—the high court rejected the very arguments Five Bridges makes here. In that case, the defendant contended that section 998(d), "properly read, applies only to expert witness fees and not other arbitration costs."[31] (*Pilimai,* at p. 150.) Our Supreme Court disagreed, holding that the language of section 998(d) "puts the arbitration plaintiff on the same footing as the plaintiff to a civil action vis-à-vis costs when the plaintiff has made an offer the defendant has refused and obtains a judgment more favorable than the offer." (*Pilimai,* at pp. 150–151.) The court declined to adopt an interpretation that would put defendants in a better position than plaintiffs for purposes of recovery of costs under section 998. (*Pilimai,* at p. 151; accord, *Scott,* at p. 1115 ["[§] 998 should be applied symmetrically and evenhandedly to both plaintiffs and defendants"].) Instead, the court concluded, "[t]here is no indication that the Legislature intended to favor arbitration defendants over arbitration plaintiffs by allowing the former but not the latter to recover the full range of costs available to plaintiffs and defendants in a civil action." (*Pilimai,* at p. 151.) As we have seen, such costs include attorney fees when authorized by contract. (*Scott,* at pp. 1112–1113.) Like the Supreme Court in *Pilimai,* we find no indication the Legislature intended to treat plaintiffs and defendants differently for purposes of awarding attorney fees as costs under section 998.

> 2. *Section 998 Treats SCI As If It Were the Prevailing Party for Purposes of Postoffer Attorney Fees*

We also reject Five Bridges's argument that SCI is not entitled to an award of fees because neither the APA nor Civil Code section 1717 authorizes a fee award. This argument is not extensively articulated, but Five Bridges appears to contend that because SCI was not the prevailing party for purposes of Civil Code section 1717, it cannot be awarded attorney fees as costs under section 998.

---

[31] While *Pilimai* involved deposition and exhibit preparation costs arising out of an arbitration proceeding (*Pilimai, supra,* 39 Cal.4th at pp. 138, 148), these factual distinctions are irrelevant for purposes of our analysis. The cost provisions of section 998 apply to both actions in court and arbitration proceedings. (See § 998, subds. (b), (c) & (d).)

*Scott, supra*, 20 Cal.4th 1103, demonstrates that Five Bridges is mistaken. In *Scott*, the plaintiff rejected the defendant's pretrial settlement offer of $900,000. (*Id.* at p. 1107.) The plaintiff later won a judgment, but it recovered an amount less than that offer. (*Ibid.*) The trial court therefore awarded the defendant its postoffer attorney fees and costs under section 998. (*Scott*, at pp. 1107–1108.) The Court of Appeal disagreed that the defendant was entitled to recover its postoffer attorney fees, based in part on its view that "attorney fees are available only to the prevailing party under [Civil Code] section 1717 and [the] defendant was not the prevailing party." (*Id.* at p. 1113.)

The Supreme Court disagreed. It explained that a defendant's entitlement to costs under section 998 derives not from its status as a prevailing party but rather from the plaintiff's failure to accept a reasonable settlement offer. (*Scott, supra*, 20 Cal.4th at p. 1114.) Obviously, since the defendant in *Scott* lost in the trial court and was required to pay substantial damages, it was not the prevailing party in the action on the contract. But under section 998, a party whose settlement offer exceeds the judgment "is treated for purposes of postoffer costs *as if* it were the prevailing party." (*Scott*, at p. 1112, italics added.) As the contract between the parties provided for an award of attorney fees to the prevailing party in the action on the contact, the defendant in *Scott* was entitled to its postoffer attorney fees. (See *id.* at pp. 1113–1116; *Mangano v. Verity, Inc.* (2008) 167 Cal.App.4th 944, 950 [84 Cal.Rptr.3d 526] [explaining that the defendant in *Scott* was entitled to fees because of combination of attorney fee clause of contract and operation of Civ. Code, § 1717].)

The reasoning of *Scott* applies with equal force here. Section 11.4 of the APA makes the "non-prevailing party" liable for "all attorney's fees, costs and expenses associated with any . . . action" arising out of the agreement. Because the APA provides for an award of attorney fees to the prevailing party, and section 998 requires that SCI be treated as if it were the prevailing party for purposes of postoffer costs, it follows that SCI is entitled to an award of its postoffer attorney fees. (§ 1032, subd. (b) ["a prevailing party is entitled *as a matter of right* to recover costs in any action or proceeding" (italics added)]; *Scott, supra*, 20 Cal.4th at p. 1114.) We therefore reverse the trial court's attorney fee order to the extent it denied SCI its postoffer attorney fees and remand the matter so that the court may determine the amount of the postoffer fee award. (See § 1033.5, subd. (c).)

## DISPOSITION

The judgment is affirmed. The attorney fee order is reversed to the extent it denied SCI an award of postoffer attorney fees under section 998(d). The matter is remanded for further proceedings to determine the amount of that award.

Costs on appeal to SCI.

Jones, P. J., and Needham, J., concurred.