Filed 3/30/21  Taxpayers for Responsible Land Use v. City of San Diego CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

# DIVISION ONE

# STATE OF CALIFORNIA

| | |
|---|---|
| TAXPAYERS FOR RESPONSIBLE LAND USE, | D075587 |
| Plaintiff and Appellant, | (Super. Ct. No. 37-2017-00042558-CU-TT-CTL) |
| v. | |
| CITY OF SAN DIEGO, | |
| Defendant and Respondent, | |
| HILLEL OF SAN DIEGO, | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed.

1

The Law Office of Julie M. Hamilton and Julie M. Hamilton for Plaintiff and Appellant.

Office of the City Attorney, Jenny K. Goodman, Deputy City Attorney, for Defendant and Respondent.

Cooley, Steven M. Strauss, Summer J. Wynn, and Barrett J. Anderson for Real Party in Interest and Respondent.

Taxpayers for Responsible Land Use (Taxpayers) appeals a judgment denying its petition for writ of mandate that challenged the approval by the City of San Diego (City) of a site development permit (SDP) and the final environmental impact report (EIR) for the construction of a religious center for Jewish students by Hillel of San Diego (Hillel) to be known as the Hillel Center for Jewish Life (Project). The center will be located on land adjacent to the University of California San Diego (UCSD) campus. On appeal, Taxpayers primarily contends: (1) substantial evidence does not support the City's approval of the SDP because it does not require the Project to have the minimum number of off-street parking spaces mandated by City ordinances; (2) the EIR for the Project did not comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) because it did not discuss a potentially relevant amendment to the City's neighborhood land-use plan adopted after the notice of preparation (NOP) of the EIR was published; and (3) the judge was biased against Taxpayers, depriving it of a fair trial. Finding none of these contentions persuasive, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2006, Hillel purchased from the City a triangular-shaped parcel of undeveloped land, known as Site 653, consisting of 15,341 square feet. The

lot is located across the street from the southerly boundary of the UCSD campus at the intersections of La Jolla Village Drive, La Jolla Scenic Drive North, and La Jolla Scenic Way. Site 653 is part of a single-family residential zone in the La Jolla Shores Planned District (LJSPD) within the La Jolla Community Plan. At the time of the purchase, the San Diego Municipal Code[1] allowed buildings used primarily for religious purposes within single-family zones. Hillel planned to develop Site 653, along with an adjacent right-of-way (ROW) to be vacated by the City in conjunction with the purchase, as a Jewish student center.

In 2006, after the City approved Hillel's proposed development—along with the sale of Site 653, the ROW vacation, and a mitigated negative declaration for that proposed development—Taxpayers filed a petition for writ of mandate challenging those approvals. The trial court granted the petition in part, finding there was a fair argument that the proposed development may have significant impacts on the environment, and denied it in part, finding the City's sale of the land was proper. On appeal, we modified the judgment to require the City to prepare an EIR for the proposed development and affirmed the judgment in all other respects. (*Taxpayers for Responsible Land Use v. City of San Diego* (D052084, Feb. 18, 2009) [nonpub. opn.].)

On October 8, 2010, following our 2009 opinion, the City published a notice of preparation (NOP) of an EIR for the Project. On July 28, 2011, Hillel's application for the Project was complete. In the final version of the Project as described in the EIR, Hillel's development of Site 653 would be

---

[1]     All code references are to the San Diego Municipal Code (SDMC) unless otherwise specified.

reduced from its original size of about 13,000 square feet to 6,479 square feet divided among three separate buildings facing a central outdoor courtyard. The Project's three buildings are: (1) a 3,682 square-foot two-story central building; (2) a 984 square-foot one-story library/chapel building; and (3) a 1,813 square-foot professional leadership building. Based on Hillel's historical programming and future plans, the religious activities at the Project will typically consist of small weekday gatherings for study groups, classes, lectures, meetings, professional staff activities, and periodic events. In general, about 10 to 50 people are expected to visit the Project at any one time. Occupancy will normally be limited to 100 people, but there may be up to eight special events per year with 100 to 150 attendees and another four special events per year with greater than 150 attendees.

The Project includes a surface parking lot with 27 parking spaces. To meet the transportation and parking demands of the 12 special events per year, Hillel adopted a transportation demand and parking management plan (Transportation Plan) that encourages alternate modes of transportation (e.g., walking or bicycling) and provides for off-site parking and a shuttle service.

As the lead agency for the Project under CEQA, the City prepared a draft EIR, which was circulated for public review and comment during 2012 and 2013. In March 2017, the City completed and circulated the final EIR for the Project, which included its responses to 78 comment letters. The final EIR concluded that the Project, as described above, would not result in any significant unmitigated impacts on the environment.

The City's Planning Commission approved the Project the following month. At a public session in October, the City Council heard testimony from

4

City staff and members of the public. It then voted unanimously to approve the Project, grant the SDP, approve the ROW vacation, and certify the final EIR as compliant with CEQA. A few days later, the City filed a notice of determination regarding the City Council's certification of the EIR.

In November 2017, Taxpayers filed a petition for writ of mandate challenging the City's approvals of the Project, the SDP, and ROW vacation, and its certification of the EIR. After previously granting Hillel's motion for judgment on the pleadings as to the petition's constitutional claims, the trial court entered a judgment of dismissal as to those claims in August 2018.[2] Roughly three months later, after considering the parties' briefs and oral arguments, the court issued a minute order denying the petition as to its remaining claims, concluding that Taxpayers "failed to carry its burden" of establishing that the City abused its discretion in approving the Project. In particular, the court found that "the City's findings in approving the SDP . . . were supported by substantial evidence." It further determined that the EIR was "sufficient as an informational document," the City "proceeded in a manner required by law," and that the determinations in the EIR were supported by substantial evidence.[3]

Judgment was entered on November 21, 2018.

_____

[2]    Taxpayers does not appeal that judgment.

[3]    To avoid repetition, the court's specific analysis of, and findings regarding, the petition's SDP and CEQA claims are discussed in more detail below.

5

## A.  Approval of the Site Development Plan

Taxpayers contends the trial court erred by denying its second amended petition for writ of mandate because substantial evidence does not support the City's approval of the SDP.  In particular, Taxpayers argues the SDP does not ensure that the Project has the minimum number of off-street parking spaces required by City ordinances.

### 1.  Supplemental Facts Regarding Parking

The EIR prepared by the City describes the Project's parking spaces and the Transportation Plan, concluding that the Project complies with City parking requirements.  Section 4.2.4.1(a) of the EIR describes the Project's parking impacts on the environment, stating:

> "[A] monthly program guide was provided by [Hillel] indicating the dates and times of the events to be held at the [Project] (see EIR Section 3.4.2.1(a)).  It is expected, with limited exception[s], that programs to be held at the site will have between 10 and 50 attendees; however, a conservative approach to the parking demand analyses is based on a total of up to 100 visitors to the facility during peak hours.  It is also expected that Hillel would employ 7 full-time staff members."

The EIR explained that "[c]urrently, no specific parking minimum or maximum requirements exist for this type of facility in the City's Municipal Code (see Chapter 14, Article 2, Division 5)."  Although the student center "would be used for religious purposes, it is not a church or place of religious assembly as defined in the Municipal Code (i.e., there are no pews or permanent seats for services; see Municipal Code Table 142-05G, Parking Ratios for Specified Non-Residential Uses)."  So consistent with City and industry standards, the City deemed it appropriate "to estimate parking

6

demand based on information for existing comparable facilities." It did so based on "the types of events/programs to be held at the facility, the amount of people expected to attend these events, the staff needed to serve the facility, survey data of existing UCSD Hillel student members, and survey and statistical data gathered from other similar Hillel facilities in California."

In addition to the City's conclusion that no specific Municipal Code parking requirements apply to the Project, section 3.3.1.1 of the EIR noted that Hillel requested a "deviation from [potentially applicable] parking regulations" in Municipal Code Table 142-05G, to provide a total of 27 parking spaces. Echoing the reasoning it employed to conclude that Table 142-05G did not apply, the EIR explained that the proposed deviation was appropriate because the Project will not be a traditional place of "religious assembly" and "does not propose pews, permanent seats for services, or assembly area."

Estimating parking needs using the alternative approach, the EIR evaluated the adequacy of proposed parking "based on data compiled from surveys of other existing Hillel facilities throughout California." Section 3.4.2.1(c) describes the results of those surveys. While the average parking ratio for the surveyed California Hillel facilities was 1.9 parking spaces per 1,000 square feet of gross floor area, the Project proposed a parking ratio of 3.7 parking spaces per 1,000 square feet of gross floor area. Also, a survey of 115 students who attend UCSD Hillel-related activities showed that 80 percent would walk to the Project and, of the 20 percent who would arrive by car, one-half would carpool. Therefore, if 100 students were to visit the Project, only 20 students would arrive by car, with 10 students driving there alone and 10 students carpooling there (i.e., 2 students in each of 5 cars).

7

The EIR concluded: "Under these assumptions, the parking demand would be 15 parking spaces [for visitors]. Assuming all seven staff members are on-site at one time and each drove individually, an additional seven spaces would be required for a total of 22 spaces. *The [P]roject proposes 27 spaces*. [¶] Therefore, through the approval of the parking deviation request based on the number of parking spaces proposed, it can be concluded that *the [P]roject is providing adequate parking*." (Italics added.)

Section 4.2.4.1(a) of the EIR discussed parking demand for special events at the Project, stating:

> "On limited occasions (see Section 3.4.2.1(a)) attendance at [Project] events could exceed the daily maximum of 100 visitors triggering the [P]roject's [Transportation Plan] (Appendix B-2; . . . ). It is anticipated that up to eight times per year, [o]ccasional special event occupancy could be between 100 and 150 attendees, and up to four times per year occupancy could be greater than 150. At no time would occupancy of the facility be allowed to exceed its maximum under the applicable code."

The Traffic Impact Analysis (TIA) (Exhibit B) and the Transportation Plan (Exhibit B-2), both of which were prepared by an engineering firm, were attached to the EIR. In particular, section 15.1 of the TIA described the survey of 115 UCSD students (as discussed above) who attend Hillel-related activities, leading to its conclusion that 15 parking spaces would be needed for attendees. When the additional seven spaces needed for staff were added to the 15 spaces for attendees, the TIA concluded that a total of 22 parking spaces were needed for the Project, which number was "well below the 27 spaces proposed" for the Project. Section 15.2 reported the results of surveys of comparable Hillel facilities at UCLA, UCSB, and CSU Northridge and concluded: "Based on the information for these similar California university Hillel facilities, it can be reasonably estimated that the 27 parking spaces

proposed for the [Project] will more than adequately serve the project site." Section 15.3 calculated that the average parking supply rate for the United States Hillel centers it surveyed was 1.2 parking spaces per 1,000 square feet and for the California Hillel centers was 1.9 parking spaces per 1,000 square feet. Because the Project will provide 3.7 parking spaces per 1,000 square feet, the TIA concluded that parking ratio "would support the assumption that the 27 spaces at the [Project] would adequately serve the facility."

Pursuant to SDMC section 142.0540(c), Hillel elected to submit a 10-page Transportation Plan (Exhibit B-2 attached to the EIR) to provide for transportation and parking during special events held at the Project. It states that the Transportation Plan "shall be adopted as a condition of the [SDP]." Noting that the Project would host up to eight special events per year with 100 to 150 attendees and up to four special events per year with 150 to 220 attendees, the Plan provides that "[s]tudents will be encouraged to walk, bike, use the existing UCSD shuttle and buses, and carpool to the facility."[4] Hillel agreed to educate all of its visitors about transportation options by distributing flyers and posting website information on alternative modes of transportation, locations of off-site parking, parking permit regulations, and recommendations for pedestrian arrival and departure. For special events at the Project, Hillel will include a shuttle route map as well as pick-up and drop-off times. During larger special events with more than 175 attendees, Hillel committed to provide: (1) 13 off-site parking spaces; (2) a shuttle service between the Project and any off-site parking locations that are at

_____

[4]     While stating there would be up to four special events per year with 150 to 220 attendees, the Transportation Plan nevertheless stated that special events at the Project would have a maximum occupancy of 220 people per the applicable building code.

9

least one-third of a mile from the Project; and (3) staff at both the Project and those off-site parking locations.[5] At least three weeks before any special event exceeding 100 attendees, Hillel will notify neighbors of the upcoming event and its parking accommodations.

The Transportation Plan also incorporates monitoring of parking and performing of post-occupancy surveys, reviews, and modifications. In particular, Hillel will survey on-street parking during the first three years of the Project's operations. and provide a means for community feedback. For the first three years, Hillel will provide the City with an annual monitoring report discussing its implementation of the Transportation Plan. It will also prepare post-occupancy evaluations confirming actual parking demand at the Project and whether there is any adverse impact on the neighborhood. The Plan further provides that if these evaluations show a need for additional off-site parking for special events, Hillel must secure such additional parking spaces as City staff requires. Section 4.2.4.2(a) of the EIR concluded: "Based on the calculated parking need, [the Project] would provide *adequate parking* for the facility. Therefore, *impacts to parking would be less than significant*." (Italics added.)

In denying Taxpayer's second amended petition, the trial court found that the City's findings in approving the SDP were supported by substantial evidence in the administrative record. Regarding the SDP, the court stated in part:

---

[5] If the off-site parking locations are within one-third mile of the Project, no shuttle service would be provided to those locations as they are considered to be within a walkable distance.

"[S]ubstantial evidence supports the City's findings that the Project will comply with the Land Development Code Regulations. . . . [¶] [T]he Parking Ratio Table 142-05G [citations], identified by [Taxpayers] as providing the parking ratio for 'churches and places of religious assembly' is inapplicable. . . . (Parking Table 142-05G provides for a parking ratio of '1 space per 3 seats; or 1 per 60 inches of [pew] space; or 30 per 1,000 square feet of assembly area if seating is not fixed' for 'churches and places of religious assembly'). The Project 'does not propose pews, permanent seats for services or assembly area.' [Citations.] As such, the parking ratio in Parking Table 142-05G is inapplicable. And the City's interpretation and application of the SDMC (parking ratio) is entitled to 'significant deference.' "

The court concluded that substantial evidence supported the City's finding that the Project would provide adequate parking for both daily use and occasional special events. It relied on the fact that the Project incorporated 27 parking spaces, which amounted to a five-space surplus above the projected need for daily use with a 100-person occupancy limit. As for the occasional special event that might exceed 100 attendees (limited to 12 times per year), the court concluded that Hillel properly "exercised its option under SDMC 142.0540(c) to vary from the minimum parking requirements by implementing the [Transportation Plan]" and that there was "substantial evidence that the [Transportation Plan] complies with the SDMC." The court specifically rejected Taxpayer's argument, based on SDMC 142.0540(c)(5), that Hillel was required to provide for the future construction or expansion of a parking facility. In the court's view, this argument "disregards the administrative record that supports the City's finding that the parking will be sufficient." Moreover, "it was not unreasonable for the City to conclude that it does not make sense to require Hillel to construct a 'parking facility' for the approximate 12 occasional

11

special events (more than 100 people) that will activate the [Transportation Plan]."

## 2. *Applicable Legal Principles*

In an administrative mandate action under Code of Civil Procedure section 1094.5, the reviewing court—whether trial or appellate—examines the decision of an agency acting in an adjudicatory capacity to determine whether it abused its discretion. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 478-479; *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1235-1236.) " 'Abuse of discretion is established if the respondent [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' ([Code Civ. Proc., § 1094.5, subd. (b)]; [citation].)" (*Sierra Club*, at p. 1236.) "In determining whether the agency complied with the required procedures and whether the agency's findings are supported by substantial evidence, the trial court and the appellate courts essentially perform identical roles." (*Environmental Protection Information Center*, at p. 479.) Our review is de novo, and we accord no deference to the trial court's conclusions. (*Ibid.*)

"In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.' [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 (*Laurel Heights Improvement Assn.*).) Because the agency is the finder of fact, we draw all reasonable inferences from the evidence to support the agency's determinations and resolve all conflicts in the evidence in favor of its

12

decision. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 985 (*California Native Plant Society*).)

However, when an issue raises a pure question of law, such as interpretation of an ordinance or other law, we review that issue independently. (*Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 634.) Nevertheless, we give considerable deference to an agency's interpretation of its *own* ordinance and uphold that interpretation unless there is no reasonable foundation for it. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219-220 (*MHC Operating Limited Partnership*).) In particular, an agency's finding that a specific project is consistent with its land development plan is "fundamentally adjudicatory." (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 154-155.) As a result, we must defer to that finding unless no reasonable person could have reached the same conclusion. (*Ibid.*) In such circumstances, the agency has unique competence to interpret its policies when applying them in an adjudicatory capacity. (*Id.* at p. 155; cf. *Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 438 [city's construction of its building code is entitled to significant deference]; *City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1091 [city's interpretation of its own code is entitled to deference].)

*3. The City Properly Approved the SDP*

Taxpayers asserts that the trial court erred in upholding the City's approval of the Project's SDP because there was insufficient evidence in the administrative record to support a finding that the Project complied with

13

applicable parking ordinances.[6]  In so arguing, it asserts we should independently review the City's findings regarding the SDP because the evidence is "undisputed."  However, we independently review only the City's interpretations of its ordinances, and even then we defer to its reasonable interpretations.  (*Doe v. Westmont College*, *supra*, 34 Cal.App.5th at p. 634; *MHC Operating Limited Partnership*, *supra*, 106 Cal.App.4th at pp. 219-220; *Harrington v. City of Davis*, *supra*, 16 Cal.App.5th at p. 438.)  As to factual issues, even if the foundational evidence were undisputed, we must still draw all reasonable inferences from the evidence to support the City's findings. (See *California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 985.)

### a.  On-site daily use parking spaces

Taxpayers argues there is insufficient evidence to support the City's finding that the number of on-site parking spaces complied with the City's applicable parking ordinances.  In particular, Taxpayers contends that section 142.0530(c) and its Table 142-05G applied to require more than the 27 on-site parking spaces for daily use at the Hillel student center.

---

[6]     The City and Hillel argue that Taxpayers waived this contention on appeal because its opening brief did not set forth all the material evidence on this issue, instead merely citing the evidence that supports its position.  (See, e.g., *Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 112-113; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626.)  Although Taxpayers' opening brief appears to deemphasize—if not wholly omit—some of the relevant evidence that supports the City's findings regarding the SDP, we decline to conclude that Taxpayers waived this contention and instead proceed to address its merits.

At the outset we note that although section 142.0530 was amended in 2015, it is the pre-2015 version of the ordinance that applies to the Project because Hillel's development application was completed in 2011.[7] At that time, as it does now, section 142.0530(c) and its associated Table 142-05G provided parking requirements for certain types of specified nonresidential uses. In 2011, the only potentially applicable parking requirements in the table were for "Churches and places of religious assembly."[8] If this provision applied, the specified parking minimum would be 85 percent of a number calculated as "1 per 3 seats; or 1 per 60 inches of . . . pew [space]; or 30 per 1,000 square feet of assembly area if seating is not fixed."

As previously noted, in its EIR the City concluded that Table 142-05G did not apply to the Project because "it is not a church or place of religious assembly as defined in the Municipal Code (i.e., there are no pews or permanent seats for services; see Municipal Code Table 142-05G, Parking Ratios for Specified Non-Residential Uses)." Giving significant deference to the City's reasonable interpretation of section 142.0530 and Table 142-05G,

---

[7] The trial court granted Taxpayers' request for judicial notice of the current versions of section 142.0530 and Table 142-05G, as well as their former versions that applied at the time of Hillel's application for the SDP. The 2015 amendment to section 142.0530 expressly provided a "grandfather clause" for permit applications completed before the amendment's effective date. Section 49 of the City Council's Ordinance No. O-20481 enacted on May 5, 2015 specified: "[N]o permits shall be issued for development that is inconsistent with the provisions of this Ordinance unless complete applications for such permits are submitted to the City prior to the date on which the applicable provisions of this Ordinance become effective . . . ."

[8] After the 2015 amendment, places of religious assembly were no longer listed as a special category. Instead, a new and broader category—"All other assembly and entertainment"—was created.

15

we conclude based on our independent review of those provisions that the specific parking ratios in the table did *not* apply to the Project. (*MHC Operating Limited Partnership*, *supra*, 106 Cal.App.4th at pp. 219-220; *Orange Citizens for Parks & Recreation v. Superior Court*, *supra*, 2 Cal.5th at pp. 154-155; *Harrington v. City of Davis*, *supra*, 16 Cal.App.5th at p. 438; *City of Monterey v. Carrnshimba*, *supra*, 215 Cal.App.4th at p. 1091.) The EIR described the religious activities to be conducted at the Project as typically consisting of small weekday gatherings for study groups, classes, lectures, meetings, professional staff activities, and periodic events. About 10 to 50 people are expected to visit at any one time. In general, occupancy will be limited to 100 people, but there may be up to eight special events per year with 100 to 150 attendees and up to four special events per year with 150 to 220 attendees. There is nothing in the EIR's description of activities or events at the Project that indicates the center will conduct any "religious assemblies" as that term is generally understood.[9] Furthermore, the fact

---

[9] In its reply brief, Taxpayers argue for the first time that the Project's parking spaces did not comply with section 142.0530(f), which provides: "Unspecified Uses. For uses not addressed by Tables 142-05E, 142-05F, and 142-05G[,] the required off-street parking spaces are the same as that required for similar uses. The City Manager shall determine if uses are similar." However, because Taxpayers did not raise this argument in the trial court or in its opening appellant's brief, we conclude it has been forfeited and cannot be raised belatedly in the reply brief. (*High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 111, fn.2; *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 573, fn. 18; *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764; *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ["Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument."].) In any event, we conclude the City Council could reasonably conclude that the 27 parking spaces comply with section 142.0530(f) because

that the City may have previously applied Table 142-05G to the 2006 version of Hillel's proposed project did not preclude it from subsequently concluding that the Table does not apply to the Project. Taxpayers does not cite any case or other authority in support of its contrary argument.

In any event, even assuming that the 2015 versions of section 142.0530(c) and Table 142-05G applied to the Project, the City Council approved a "deviation" from those parking requirements and instead required parking spaces based on the Project's specific needs. Section 3.3.1.1 of the EIR stated that Hillel requested a "deviation from parking regulations, Municipal Code Table 142-05G," which "would provide a total of 27 parking spaces" as discussed in sections 4.1.3.1 and 4.2.4.1 of the EIR. Section 3.4.2.1(c) of the EIR explained that the reasons for allowing a deviation were much the same as those that suggested the inapplicability of Table 142-05G:

> "[The table] identifies parking requirements for '[c]hurches and places of religious assembly.' This category of use considers the parking needs associated with gatherings of large numbers of people at the same time. This is demonstrated by the units of measure being 'seats,' 'pew space,' and/or 'assembly area.' The day-to-day activities are not used as traditional assembly areas. The project does not propose pews, permanent seats for services, or assembly area. A Parking Deviation Request is proposed (see Final EIR Section 3.3). The deviation would allow the [P]roject to provide parking based on the specific needs of the facility as determined by existing comparable facilities."

they were calculated based on the Project's actual parking needs as shown by the TIA's analysis of parking provided at comparable Hillel facilities, which could be construed as "similar uses" within the meaning of section 142.0530(f).

17

Based on the TIA's surveys of comparable Hillel facilities, the EIR concluded: "The [P]roject proposes 27 spaces. [¶] Therefore, through the approval of the parking deviation request based on the number of parking spaces proposed, it can be concluded that the [P]roject is providing adequate parking."

Thus, even to the extent that former section 142.0530(c) and Table 142-05G might apply, the City Council exercised its discretion to grant Hillel a deviation from those parking requirements and instead allowed it to provide parking spaces for the Project based on its specific needs as calculated in the TIA. Taxpayers does not assert, much less show, that the City Council did not have the discretion to grant such a deviation or that it abused its discretion by doing so. Accordingly, we presume the City Council acted properly in granting a deviation for the Project and allowing Hillel to calculate its parking space needs through surveys and a review of comparable Hillel facilities.

If Taxpayers means to assert that the surveys of Hillel facilities at similar institutions and other data used to calculate the Project's daily use parking needs are unreliable or inadequate, it misconstrues and/or misapplies the substantial evidence standard of review. (*Laurel Heights Improvement Assn.*, *supra*, 47 Cal.3d at p. 393; *California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 985.) In particular, Taxpayers argues the surveys of Hillel's student members should have been conducted by a third party rather than Hillel. But it makes no attempt to show that this purported procedural deficiency caused substantial inaccuracies in the outcome of those surveys or resulted in a significantly lower number of parking spaces calculated for the Project's parking needs.

18

Taxpayers also complains that the surveys were conducted in 2010, which was seven years before the SDP and final EIR for the Project were approved. It argues that since 2010, the student population at UCSD increased by 15 percent and the J. Craig Venter Institute opened nearby, increasing overall demand for parking in the vicinity. The challenged surveys were conducted near the time of the NOP and shortly before the development application was deemed complete in 2011. Taxpayers cites no authority that would require Hillel or the City to conduct new or updated student surveys simply because there was an extended process under CEQA from the initial publication of the NOP until the City Council's approvals of the SDP and the final EIR. Nor does it show that this purported temporal deficiency caused material inaccuracies in the results of those surveys or resulted in erroneous calculations for the Project's parking needs. In fact, the TIA concluded the Project's daily parking needs required 22 parking spaces. The Project will have 27 parking spaces, providing five additional parking spaces in excess of its required 22 parking spaces. Taxpayers would have to demonstrate there is reason to believe that had Hillel or the City conducted student surveys closer in time to the final EIR, the number of required parking spaces for the Project's daily needs would have exceeded 27 parking spaces. It has not done so.

Finally, Taxpayers challenges the adequacy of the surveys of comparable Hillel facilities (e.g., at UCLA, UCSB, and CSU Northridge), citing an opinion of Robert Kahn, its expert engineer.[10] But the fact that

10 Taxpayers' opening brief includes a quote from Kahn's letter, which states: "A parking evaluation needs to be based upon actual empirical data and parking surveys from at least three (3) similar facilities. The parking utilization studies should not only count vehicles parked at the parking lot of these facilities, but also along the adjoining roadways and streets for vehicles

Taxpayers' expert may have disagreed with how Hillel's expert engineering firm produced the calculations for parking space needs does not mean there is insufficient evidence to support the City Council's finding—implicit in its approval of the SDP and the final EIR—that the Project's 27 parking spaces will meet its daily parking requirements. (*Laurel Heights Improvement Assn.*, *supra*, 47 Cal.3d at p. 393; *California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 985; cf. *Better Alternatives for Neighborhoods v. Heyman* (1989) 212 Cal.App.3d 663, 672 [contrary opinion of opponent's expert "does not render the opinions of the [agency's] experts insubstantial"].)

### b. *Special Event Parking and the Transportation Plan*

Taxpayers also asserts that even if the surveys and other studies in the TIA provide substantial evidence to support a finding that 27 on-site parking spaces meet the Project's daily use needs, the Transportation Plan's provisions for the Project's occasional special events do not comply with applicable sections of the San Diego Municipal Code. In particular, Taxpayers argues that Table 142-05G requires that the Project provide one space for every three people at its maximum capacity (i.e., 220 people), or a total of 73 parking spaces. As we have already discussed, however, the 2011 version of Table 142-05G does not apply because the Project is not a church or place of religious assembly and does not provide any seats, pews, or assembly areas. Furthermore, to the extent that table applied to the Project, the City Council approved a deviation from the parking space ratios, permitting

_____

that are utilizing the Hillel facility. In any case, any of the visitors may be parking along the adjacent street using the center, these need to be accounted for in the parking utilization study."

parking requirements to be calculated based on comparable Hillel facilities (i.e., per the TIA).

Specifically with regard to transportation and parking needs for the occasional special events to be held at the Project (up to 12 events per year), the EIR included the Transportation Plan (Exhibit B-2), which was approved pursuant to section 142.0540(c) as an alternative to any other parking ordinances that would otherwise apply.[11]  It requires that Hillel provide 13 additional off-site parking spaces when it holds special events with more than 175 attendees and a shuttle service between the Project and any off-site parking locations that are at least one-third of a mile from the center.  This represents a reasonable way to address parking needs for the occasional unusual event.

Focusing on the 13 off-site parking spaces required for special events, Taxpayers claims the Transportation Plan violates section 142.0535(b) because it does not provide any off-site parking within 600 feet of the Project.[12]  However, the record on appeal includes a map showing there is an

[11]     Section 142.0540(c) permits a variance from minimum parking requirements with the approval of a Transportation Demand Management (TDM) Plan, subject (among other things) to the requirement that "the number of automobile parking spaces provided [not] be less than 85 percent of the minimum that would otherwise be required."  (SDMC § 142.0540(c)(3).)  But because Table 142-05G does not apply to the Project, Taxpayers cannot rely on it to argue that the otherwise minimum number of parking spaces *for special events* should be one-third of 220, the building code occupancy limit.

[12]     Section 142.0535 provides that "[r]equired off-street parking spaces for [non-residential] uses" may be located off-premises as long as "*[s]ome portion* of the off-premises parking shall be within a non-residential zone and within a 600-foot horizontal distance of the premises on which the use requiring off-

21

adjacent UCSD parking lot that is within 596 feet of the Project. Furthermore, Taxpayers concedes that off-site parking could be available at the J. Craig Venter Institute, which is also within 600 feet of the Project. Therefore, there is substantial evidence to support the City's finding that section 142.0535(b)'s requirements were satisfied.

We thus reject Taxpayer's proffered interpretations of the relevant parking ordinances, as well as its argument that there is insufficient evidence to support the City Council's findings that the Project's 27 on-site parking spaces and the Transportation Plan comply with the parking ordinances and satisfy the Project's parking needs. Accordingly, we conclude the City acted properly in approving the SDP for the Project.

## B. Compliance with CEQA

Taxpayers asserts that the EIR for the Project did not comply with CEQA because it failed to analyze an inconsistency between the Project and current zoning requirements created by an amendment to the City's land-use plan for the LJSPD that was adopted five years after the NOP was published in 2010. The 2015 amendment deleted the former provision that allowed buildings primarily used for religious purposes in single-family residential zones.

## 1. Applicable Legal Principles

The standards for assessing the adequacy of an EIR are well settled. "The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is

---

street parking spaces is located . . . ." (Original emphasis omitted; new emphasis added.)

likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511.)  To make an assessment of any significant adverse effects a project is likely to have on the physical environment, "an EIR must delineate environmental conditions prevailing absent the project, defining a [']baseline['] against which predicted effects can be described and quantified."  (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447 (*Neighbors for Smart Rail*).)

The CEQA guidelines provide that "[a]n EIR must include a description of the *physical environmental conditions* in the vicinity of the project.  This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact [of a proposed project] is significant. . . .  (1) Generally the lead agency should describe physical environmental conditions *as they exist at the time the notice of preparation* [NOP] *is published . . . .*"  (Cal. Code Regs., tit. 14, § 15125, subd. (a), italics added.[13])  Furthermore, an EIR must "discuss any inconsistencies between the proposed project and applicable general plans, specific plans and regional plans."  (Guidelines, § 15125, subd. (d).)  "*Where a proposed project is compared with an adopted plan, the analysis shall examine the existing physical conditions at the time the notice of preparation* [NOP] *is published . . . .*"  (Guidelines, § 15125, subd. (e), italics added.)

Under CEQA, an EIR is presumed adequate.  (Pub. Resources Code, § 21167.3; *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260,

---

[13]    Title 14, section 15000 et seq. of the California Code of Regulations is referred to herein as the Guidelines.

23

275.) "We review an agency's determinations and decisions for abuse of discretion.  An agency abuses its discretion when it fails to proceed in a manner required by law or there is not substantial evidence to support its determination or decision.  ([Pub. Resources Code,] §§ 21168, 21168.5; [citation].)  'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.'  [Citation.]"  (*Preserve Wild Santee*, at p. 275.)  "[I]n reviewing an EIR for CEQA compliance, we adjust our 'scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts.' [Citation.]  For example, where a petitioner claims an agency failed to include required information in its environmental analysis, our task is to determine whether the agency failed to proceed in the manner prescribed by CEQA."  (*Ibid.*)  Therefore, we review de novo the question of whether an agency failed to include required information in an EIR.  (*Ibid.*)

Under CEQA, there is no presumption that an omission of required information or other error is prejudicial.  (Pub. Resources Code, § 21005, subd. (b); *Neighbors for Smart Rail*, *supra*, 57 Cal.4th at p. 463.)  " 'CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive.' " (*Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1145.) Insubstantial or merely technical omissions are not grounds for relief. (*Neighbors for Smart Rail*, at p.463.)  "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the

24

statutory goals of the EIR process." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712; see also *Sierra Club v. County of Fresno, supra*, 6 Cal.5th at p. 515.)

*2. The failure to discuss an inapplicable land-use plan amendment enacted five years after the Notice of Preparation did not make the EIR inadequate.*

In 2010 when the NOP was published, section 1510.0303(e) expressly allowed single-family residential zones to include churches and permanent buildings used primarily for religious purposes. That section was amended in 2015 to delete former subdivision (e). The amendment had the effect of prohibiting churches and other religious buildings in single-family zones if applications for such buildings had not been completed by the time of the 2015 amendment.[14] Section 49 of the amending ordinance (No. O-020481) added an express "grandfather clause," stating: "[N]o permits shall be issued for development that is inconsistent with the provisions of this Ordinance unless complete applications for such permits are submitted to the City prior to the date on which the applicable provisions of this Ordinance become effective . . . ."

---

[14] In 2010, section 1510.0303 provided: "In the Single-Family (SF) Zone, designated on that certain map referenced in Section 1510.0102, no building or improvement or portion thereof shall be erected, constructed, converted, established, altered, or enlarged, nor shall any premises be used except for one or more of the following uses:

"(a) One-family dwellings. [¶] . . . [¶]

"(e) Churches, temples or buildings of a permanent nature, used primarily for religious purposes."

In May 2015, the City Council amended section 1510.0303 to delete former subdivision (e), thereby removing churches, temples or other religious buildings as a permitted use in single-family zones in the LJSPD.

Section 4.1.1.1(c) of the final EIR discussed the Project's consistency with applicable land development code regulations. It accurately stated that "[a]ccording to the LJSPD Ordinance, 'churches, temples, or buildings of a permanent nature, used primarily for religious purposes' are permitted uses within the residential zones (Municipal Code Section 1510.0303(e) [Single-Family Zone - Permitted Uses])." On this basis section 4.1.4.1(a) of the EIR concluded that the Project "would be a permitted use within [the] residential zone in accordance with this section of the City Municipal Code."

Taxpayers argues that although the EIR discussed the Project's consistency with the *applicable* LJSPD zoning ordinance (i.e., the 2010 version of § 1510.0303), the EIR was prejudicially deficient as an informational document because it omitted any discussion of the Project's inconsistency or nonconformance with the *post-2015* version of section 1510.0303. Alternatively stated, Taxpayers contends the EIR should have considered that the Project would not have been consistent with the post-2015 version of section 1510.0303, the express terms of which provided that it did not apply. In support of its argument, Taxpayers notes that the EIR mentioned other post-2010 NOP actions by the City, including a discussion of greenhouse gases under the City's climate action plan (CAP) adopted in 2015.[15] It thus complains that the EIR failed to consistently use a stable baseline in evaluating the physical environmental conditions in the vicinity of the Project.

---

[15] Taxpayers also notes the EIR made changes in its energy use and conservation section and water quality section to reflect code and permit changes instituted after 2010.

As previously noted, section 15125 of the Guidelines required the EIR to include a description of the *physical environmental conditions* in the vicinity of the Project—referred to as the baseline physical conditions—as they existed at the time of publication of the NOP for the Project. (Guidelines, § 15125(a)(1).) The focus of an EIR is on potential significant effects that a project may have on the physical environment as measured from the baseline. Taxpayers does not cite, nor are we aware of, any statute, regulation, or case authority that requires an EIR to include in a project's "baseline physical conditions" a discussion of baseline *legal* (i.e., statutory or regulatory) conditions. So regardless whether we are considering the Municipal Code as it existed before or after the 2015 amendment, section 1510.0303 is not part of the baseline physical conditions of the Project's vicinity within the meaning of Guidelines section 15125(a).

In any event, even if the existing legal landscape could be considered part of a project's baseline physical conditions, Guidelines section 15125(e) specifically provides that "[w]here a proposed project is compared with an adopted plan, the analysis shall examine the existing physical conditions *at the time the notice of preparation* [NOP] *is published . . . .*" (Italics added.) Therefore, the only discussion of section 1510.0303 that arguably may be required by the Guidelines is the version of that ordinance when the NOP was published for the Project. (Guidelines, § 15125 subds. (a), (e).) Because the NOP for the Project was published in 2010, only the 2010 version of section 1510.0303 could arguably be considered part of the Project's baseline physical conditions. Accordingly, contrary to Taxpayer's assertion, the post-2015 version of section 1510.0303 is *not* part of the Project's baseline physical conditions and therefore no discussion of it was required in the final EIR for the Project.

27

The fact that the EIR discussed other post-2010 NOP actions by the City, such as the City's CAP adopted in 2015 addressing greenhouse gas issues, does not show the EIR failed to use a stable baseline for evaluating the Project's potential impacts on the physical environmental conditions in the vicinity of the Project.[16]  Rather, by not expressly electing another time for determining the Project's baseline physical conditions, the City implicitly adopted Guidelines section 15125(a)(1)'s default timing for the Project's baseline physical conditions (i.e., in 2010 at the time the NOP was published for the Project), which provided a stable, nonfluctuating baseline.  Any discussion of greenhouse gases under the City's 2015 CAP did not alter the applicable 2010 date for the EIR's discussion of the baseline physical conditions in the vicinity of the Project.[17]

_____

[16]    In its reply brief, Taxpayers appears to argue that the EIR was deficient because it did not discuss the post-2015 version of section 1510.0303 as relevant to the "human use of the land" within the meaning of Guidelines section 15126.2.  But because Taxpayers did not raise this argument in the trial court or in its opening appellant's brief, we conclude it has been forfeited.  (*High Sierra Rural Alliance v. County of Plumas*, *supra*, 29 Cal.App.5th at p. 111, fn.2; *SCI California Funeral Services, Inc. v. Five Bridges Foundation*, *supra*, 203 Cal.App.4th at p. 573, fn. 18; *Paulus v. Bob Lynch Ford, Inc.*, *supra*, 139 Cal.App.4th at p. 685; *Reichardt v. Hoffman*, *supra*, 52 Cal.App.4th at p. 764; *American Drug Stores, Inc. v. Stroh*, *supra*, 10 Cal.App.4th at p. 1453.)

[17]    Because the post-2015 version of section 1510.0303 did not apply to the Project by virtue of the express grandfather clause, the EIR accurately stated in its greenhouse gas section that the Project is consistent with "existing general and community plans and zoning regulations and, therefore, able to proceed to an analysis of project consistency with CAP Strategies."  Thus, contrary to Taxpayers' assertion, the Project was not inconsistent with section 1510.0303 at the time the CAP was adopted.

Reprising a similar theme, Taxpayers argues that the EIR was deficient because it omitted any discussion of the Project's inconsistency or nonconformance with the post-2015 version of section 1510.0303. But the Guidelines only require an EIR to "discuss any inconsistencies between the proposed project and *applicable* general plans, specific plans and regional plans." (Guidelines, § 15125, subd. (d), italics added.) This mandated an evaluation of any inconsistencies between the Project and the *applicable* LJSPD zoning ordinance (i.e., § 1510.0303).[18] A project's potential environmental impacts are generally evaluated based on the physical conditions in the vicinity of the project at the time of publication of a NOP, so only the 2010 version of section 1510.0303 was relevant to the EIR's discussion of whether the Project was inconsistent with the LJSPD zoning ordinance. (Guidelines, § 15125(a), (d), (e).) Because the 2010 version of section 1510.0303 expressly allowed the Project's building in a single-family zone (i.e., "buildings of a permanent nature, used primarily for religious

_____

[18]    Taxpayers' citation to a checklist in Appendix G to the Guidelines adds nothing to the argument. That checklist includes item XI(b) regarding land use and planning, setting forth the question of whether the proposed project would "[c]ause a significant environmental impact due to a conflict with any land use plan, policy, or regulation adopted for the purpose of avoiding or mitigating an environmental effect?" (Guidelines, Appen. G(XI)(b).) Because the 2015 amendment, by its express terms, did not apply to projects where the NOP had already been published, there could be no "conflict." Moreover, Taxpayers fail to identify any "significant environmental impact" the 2015 amendment was designed to avoid or mitigate.

purposes"), the Project was *not* inconsistent with that applicable zoning ordinance.[19] (Former § 1510.0303(e).)

In the final analysis, the final EIR was not a deficient informational document because it omitted a hypothetical discussion that the Project *would have been inconsistent* with section 1510.0303 *if* its NOP had been published *after* 2015. To the contrary, because of section 1510.0303's grandfather clause, the Project was consistent with, and a conforming use under, applicable zoning rules such that the EIR was not required to discuss the 2015 deletion of former subdivision (e). Accordingly, based on our de novo review of the record, we conclude that the final EIR for the Project included all relevant information regarding the Project's consistency with section 1510.0303 and did not preclude informed decisionmaking by the City Council or public participation as required by CEQA.[20] (*Sierra Club v. County of Fresno, supra*, 6 Cal.5th at p. 515; *Kings County Farm Bureau v. City of Hanford, supra*, 221 Cal.App.3d at p. 712.)

## C. *Claims of Judicial Bias*

After reviewing the briefs and the record, the court issued a lengthy tentative ruling proposing to deny Taxpayers' petition for writ of mandate.

---

[19] Although largely a matter of semantics, by virtue of the express "grandfather clause" in the amending ordinance the Project is consistent even with the post-2015 version of section 1510.0303.

[20] While we conclude the EIR was fully compliant as an informational document, we note that the City Council, as the CEQA decisionmaker, was necessarily aware of the post-2015 amendment to section 1510.0303 because it was the legislative body that passed the amending ordinance. Public comments to the draft EIR also included references to the post-2015 version of section 1510.0303.

Oral argument was conducted the following day. Pointing to several exchanges between the court and counsel during argument as evidence of bias, Taxpayers contends it was denied a fair hearing before an impartial judge.

*1. Procedural posture and the applicable legal standard*

Code of Civil Procedure section 170.1 et seq. creates a comprehensive statutory scheme to address claims that a superior court judge should disqualify himself or herself on grounds of actual or apparent bias. Such a disqualification request must be made "at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification." (Code Civ. Proc., § 170.3, subd. (c)(1).) Section 170.3 further provides strict time requirements for resolving a motion for disqualification, and decisions on such a motion can only be reviewed on a petition for writ of mandate filed "within 10 days after service of written notice of entry of the court's order determining the question of disqualification." (Code Civ. Proc., § 170.3, subd. (d); see *People v. Panah* (2005) 35 Cal.4th 395, 444.) A failure to seek immediate writ review generally forfeits any argument based on the statutory disqualification factors. (*People v. Freeman* (2010) 47 Cal.4th 993, 1000 (*Freeman*).)

Even where a party does not seek—or elects not to pursue—the statutory disqualification remedy, there are rare circumstances where fundamental due process guarantees may require reversal of a judgment on a showing of "the probability of actual bias" by the court that entered the judgment. (*Freeman, supra,* 47 Cal.4th at p. 1006; see also *Caperton v. A.T. Massey Coal Co., Inc.* (2009) 556 U.S. 868, 887 (*Caperton*).) The United States Supreme Court has characterized these due process grounds for

31

judicial disqualification as a "constitutional floor" that supplements "the ceiling set 'by common law, statute, or the professional standards of the bench and bar.' " (*Caperton*, at p. 889, quoting *Bracy v. Gramley* (1997) 520 U.S. 899, 904.) And our Supreme Court has emphasized that cases meeting this constitutional standard will be "extraordinary" ones that involve "extreme" or "exceptional" facts. (*Freeman*, at pp. 1004-1006.) It is not our role "to examine whether the trial judge's behavior left something to be desired, or whether some comments would have been better left unsaid." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589.)

It is important to recognize at the outset that Taxpayers never filed a motion to disqualify Judge Taylor pursuant to Code of Civil Procedure section 170.1 et seq. Although both parties' briefing focuses primarily on whether the circumstances in this case rise to the level of a due process violation, Taxpayers does suggest the more lenient statutory standards should apply when the challenged behavior occurred during a trial or, as in this case, during a hearing that precipitated the court's substantive ruling.

We do not doubt that the timing here would have made the filing of a statutory disqualification motion difficult. Although the court took the matter under submission after the conclusion of argument, its ruling was filed later the same day. It would likely have been impossible for Taxpayers' counsel to prepare a verified statement of disqualification before the ruling was issued. Even so, Code of Civil Procedure section 170.3, subdivision (b)(4) specifically permits the filing of a challenge "after the judge has made one or more rulings in a proceeding, but before the judge has completed judicial action in a proceeding." In this case, even though the court's ruling was issued on the same day as the hearing, judicial action was not completed until at least two weeks later when the judgment was entered. Moreover, the

32

filing of a disqualification motion may well have delayed the entry of judgment while the motion was being considered. Even assuming the motion was denied, Taxpayers would then have been able to seek prompt writ review pursuant to the statute. (Code Civ. Proc., § 170.3, subd. (d).)

Because Taxpayers elected to raise the issue of judicial bias on appeal from the final judgment, we review the record to determine if it shows the probability of actual bias sufficient to implicate due process concerns, and not merely the appearance of bias. As we will explain, however, even were we to apply the more lenient statutory standards found in Code of Civil Procedure section 170.1, we would nonetheless conclude there has been no showing of actual or apparent bias sufficient to warrant the disqualification of Judge Taylor.

### 2. *There is no evidence of judicial bias*

Taxpayers cites various passages from the hearing transcript to demonstrate that Judge Taylor treated the parties differently during argument. It maintains this differential treatment means the judge "had a predisposition against [Taxpayers]." Taxpayers complains that Judge Taylor strongly disputed its counsel's arguments[21] and expressed skepticism about

---

21    As an example, Taxpayers cites an exchange where its counsel mentioned the "greenhouse gasses" created by cars searching for limited parking. Judge Taylor challenged counsel, "That's the first time that phrase has come up in this entire case," suggesting, "that's impermissible." It appears counsel started to respond, but was cut off by the court, "I want you to make a record, but I don't want you to start offering things that have not been briefed . . . . Tell me why you think my tentative is wrong." Counsel elected to move on to a different point by saying that "[p]arking impacts are not just related to milling about looking for a parking space."

the motives of the organization and its members.[22]  At the same time, the City and Hillel were, in Taxpayers' view, treated with kid gloves.  It claims the judge was "helpful" and "agreeable" when defendants were making their presentations.  Supposedly, he "ask[ed] questions in a friendly manner" and "even thanked [counsel for the City] for responding to his question, a courtesy that was never extended to [Taxpayers' counsel]."  Likewise, he "gently" corrected errors rather than issuing harsh admonishments.[23]

---

[22]  At one point, Taxpayers' counsel was suggesting the City should have prepared an errata and recirculated the EIR.  Judge Taylor inquired, "Is this your recirculation argument? . . . [T]his is why project opponents get a bad reputation.  It's just delay followed by delay followed by more delay."  Counsel attempted to respond but was again cut off by the judge.  "[F]urther recirculation is just code for more delay, and—that's what your clients want.  They want to out wait their proponents [*sic*].  That's how I perceive this."  Shortly thereafter, the judge returned to the question of delay and what it suggested about Taxpayers' motives.  "Let's face it, the only mitigation your clients would be satisfied with is a continued vacant lot. . . .  They want no project; they want the no project alternative."  When counsel asserted that was "not true," the judge challenged her by referring to a particular document in the record, which he asserted showed that "[y]ou want this to be a vacant lot."  Counsel responded with evident frustration, "Your Honor, that's—I'm sorry to argue with a Judge, it's not my normal style, but that is not accurate."

[23]  As an example, Taxpayers refers to an instance where the deputy city attorney inadvertently argued that the City "allowed previous conforming uses to be used for those projects that were already deemed complete."  Judge Taylor corrected her, "You meant to say where the application was already deemed complete?  Not the project itself, correct?"  Recognizing her error, counsel said, "Yes, you are absolutely right."  The judge offered, "At least you know I am listening."
    On the other hand, Taxpayers' transcript citations appear to be selective in at least certain respects.  The initial presentation by Taxpayers' counsel ended with her comment that she could not understand "why it took that long to do an appropriate document[?]"  She added, "[I]t's not that hard."

We can accept that the transcript reflects the judge treated the parties and their arguments differently. This is neither surprising, nor reflective of bias. By the time of the argument, the judge had already read the briefs and reviewed the record. He had issued a comprehensive 15-page single-spaced tentative ruling in favor of the defendants. In light of that, it would probably be surprising if he did *not* treat counsel differently. One would expect that Taxpayers' counsel would be on the receiving end of more pointed and even skeptical questions, since by that point in the proceedings the burden was on her to convince the judge that he should change his tentative views.

Of course, a tentative ruling is just that—tentative—and judges must remember that the courtroom environment should encourage lawyers to respectfully express and explain contrary viewpoints. Both attorneys and judges can disagree without being disagreeable. That said, Code of Civil Procedure section 170.2 specifically declares that "[i]t shall *not* be grounds for disqualification that the judge . . . [h]as in any capacity expressed a view on a legal or factual issue presented in the proceeding . . . ." (Italics added.) Here, the portions of the transcript relied on by Taxpayers reflect Judge Taylor's expression of his views on the issues in the case formed after an obviously thorough review of the briefs and record. That he had come to favor— perhaps strongly favor—one side's position in the dispute does not change the fact that he was expressing his opinions on the legal and factual issues in the case. (See, e.g., *Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1219.) In no way do the comments reflect bias in the sense

_____

Judge Taylor disagreed, but responded graciously. "You know, I have to tell you, I don't think I can accept that, because I see an awful lot of these cases and it seems to be hard. . . . [W]e have smart people doing it, yourself included, because it is hard."

35

of an inclination to rule against Taxpayers for reasons unrelated to the merit of the arguments. Although by the time of the hearing Judge Taylor might have been *disposed* to find in favor of the City and Hillel based on his evaluation of the parties' respective contentions, he was not *predisposed* to do so at the start of his decision-making process.

Taxpayers points to two specific exchanges during the hearing that it contends reflect bias against the organization and its members. Counsel for Taxpayers at one point represented that her clients were not unalterably opposed to development of the site and were willing to accept single-family residences in that location. "Their problem," she said, "is with a student center and the intensity of use in a student center across a 32-foot street from single-family residences." She later added, "[T]hey have a huge desire for this project to be located somewhere else."

Not expecting a response, Judge Taylor commented, "There is an acronym for that." A few pages later in the transcript, Taxpayers' counsel made clear she understood which acronym the judge was referring to. "[W]e can't be held responsible because the city failed to do the analysis. We're being held -- all of a sudden we're NIMBYs, and we're delay, delay, delay, because the city failed to do very obvious things that were brought to their attention . . . ."

Taxpayers asserts that "NIMBY" is a pejorative term, and Judge Taylor's reference to it indicates that he was focused on the organization's motives in bringing the action rather than the merit of the legal arguments. We see no indication that the judge intended a pejorative characterization. Indeed, he did not actually use the acronym—which means "not in my backyard"—but merely referred to it. Although the term implies acting

36

consistent with self-interest, several standard sources provide definitions that include no necessary pejorative connotation. (Merriam-Webster Online Dictionary (2021) <https://www.merriam-webster.com/dictionary/nimby> (as of Mar. 29, 2021) ["opposition to the locating of something considered undesirable (such as a prison or incinerator) in one's neighborhood"]; *Cambridge Advanced Learner's Dictionary & Thesaurus*, Cambridge Dictionary Online (2021) <https://www.dictionary.cambridge.org/us/dictionary/english/nimby> (as of Mar. 29, 2021) ["a person who does not want something unpleasant to be built or done near where they live"].)

Moreover, Taxpayers again misunderstands the meaning of judicial bias. Judge Taylor may have read Taxpayers' motives correctly or incorrectly. But whatever conclusions he drew, they were based on the evidentiary record, the legal positions of the parties, and the arguments made in support of them. Potential legal error is not the same thing as judicial bias.

In conjunction with the same discussion, counsel for Taxpayers suggested that instead of putting the Hillel student center on the proposed site, it could be located next to an existing Jewish temple in the area.[24] She later repeated her assertion that this would be a preferable alternative: "Had they moved this project perhaps over to the Temple that's nearby, they might have been able to meet achieve their -- " On this latter occasion, Judge Taylor appeared to take umbrage:

---

[24]    Counsel argued: "Well, there's a huge synagogue, temple -- I'm sorry, what do you call the -- I get confused and I have to apologize. I don't have the nomenclature, but there's a huge Jewish site within a quarter of a mile. There's another one within -- just a couple of blocks down from them. This is in the neighborhood. Is this the only possible place?"

"You know, that's the second time you have said that. . . . I asked an open-ended question, and twice now you have said, move it over there by the Temple. I'm sorry, but we don't do that in the United States. We don't put people where we want them to be. Okay? That's -- that is evocative of Eastern Europe and it's not appropriate."

Taxpayers points to this exchange as evidence that Judge Taylor was biased against the organization because he unreasonably construed an argument about an alternative location with more parking as an indication that Taxpayers was anti-Semitic.

The record reflects that Taxpayers was a neighborhood citizens group that opposed a student center in a residential neighborhood.[25] There is nothing to suggest this opposition had anything to do with that fact that Hillel was a *Jewish* student organization. It is certainly true that judges have an ethical obligation to ensure that "lawyers in proceedings before the judge . . . refrain from . . . manifesting, by words or conduct, bias, prejudice, or harassment based upon . . . religion . . . ." (Cal. Code of Judicial Ethics, Canon 3B(6).) At the same time, accusing a lawyer of bias or prejudice in a public courtroom is a serious matter that carries with it a strong sense of opprobrium. Judges must take care not to draw adverse conclusions too quickly lest it turn out that there was merely a misunderstanding. Giving counsel the benefit of the doubt and confirming a suspected meaning before issuing an admonishment will often be the wisest course.[26]

---

[25] In its second amended petition for writ of mandate, Taxpayers alleged that it was a California nonprofit social welfare organization "[d]edicated to preserving the special community of La Jolla."

[26] For instance, Taxpayers' counsel could have been asked nonjudgmentally, "That's the second time you have mentioned property next

But again, misinterpreting counsel's argument is not evidence of bias, and certainly does not demonstrate a probability of actual bias. Although the suggestion of anti-Semitism was unwarranted, counsel's argument raised a legitimate question why she was proposing that several Jewish facilities be located together. Judge Taylor was responding to the argument, not relying on matters extraneous to the merits of the case. That he might have responded differently does not change the fact that he was "express[ing] a view on a legal or factual issue presented in the proceeding" (Code Civ. Proc., § 170.2), which is specifically excluded as a basis for disqualification.

Whether they are evaluated for "the probability of actual bias" or under the more lenient standards in Code of Civil Procedure section 170.1 et seq., the court's statements in this case provide no basis for disqualification. In sum and substance, Taxpayers' complaint is that Judge Taylor showed insufficient patience and/or should have extended more courtesy toward its counsel. Judicial patience and courtesy are not unimportant considerations, but questions of temperament and demeanor are not the same as bias. And this is particularly true where, as here, the challenged comments by the trial judge concern only the merits of the case and the arguments of counsel. Taxpayers was not deprived of a fair hearing.

---

to the Jewish Temple as an alternative site. Why is that location preferable to the proposed site or other alternatives?" If the answer did not completely clarify, a more pointed question that still left counsel a path of retreat might have been appropriate: "Certainly you're not suggesting there be a designated Jewish section in the campus community?"

39

DISPOSITION

The judgment is affirmed.  Defendants and real parties are entitled to their costs on appeal.

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.